Lloyd GOODELL, Dennis Goodell,
and Scott Goodell, Appellants,

v.

HUMBOLDT COUNTY, Iowa, and
Doug Wood, Appellees.

HUMBOLDT COUNTY LIVESTOCK
PRODUCERS, et al., Appellants,

v.

HUMBOLDT COUNTY, Iowa,
et al., Appellees.

No. 97–790.

Supreme Court of Iowa.

March 5, 1998.

Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellants Humboldt County Livestock Producers, et al.

Brian L. Wirt and Gary M. Myers of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellants Lloyd Goodell, Dennis Goodell, and Scott Goodell.

James E. Brick of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for appellees.

Paul S. Swinton of Morain, Burlingame & Pugh, P.L.C., West Des Moines, for amici curiae Agribusiness Association of Iowa, Iowa Cattlemen's Association, Iowa Corn Growers Association, Iowa Dairy Products Association, Iowa Farm Bureau Federation, Iowa Institute for Cooperatives, Iowa Pork

Producers Association, Iowa Poultry Association, Soybean Association, and Iowa Turkey Federation, and Christina L. Gault of Iowa Farm Bureau Federation, West Des Moines, for amicus curiae Iowa Farm Bureau Federation.

TERNUS, Justice.

The regulation of livestock confinement operations is a matter of growing public debate in this state. In the case before us, livestock producers have challenged four ordinances adopted by the Humboldt County Board of Supervisors that regulate large livestock confinement facilities and operations. The plaintiffs claim the ordinances are invalid because they address a matter of statewide concern, and because the county's authority has been preempted by the Iowa legislature. The defendants seek to sustain the validity of the ordinances as a valid exercise of the county's home rule authority. The district court upheld all but one section of one ordinance. Because we conclude the county's authority to enact these ordinances has been preempted by the legislature, we reverse the district court's ruling and remand for entry of summary judgment in favor of the plaintiffs.

## I. Background Facts and Proceedings.

A. *The ordinances.* In October of 1996, the Humboldt County Board of Supervisors adopted four ordinances applicable to "large livestock confinement feeding facilities."[1] Each ordinance addresses a different matter of concern to the county: (1) ordinance 22 imposes a permit requirement prior to construction or operation of a regulated facility; (2) ordinance 23 establishes financial security

requirements; (3) ordinance 24 implements groundwater protection policies; and (4) ordinance 25 governs toxic air emissions from regulated facilities. We will highlight the pertinent provisions of each ordinance.

1. *Ordinance 22—permit requirement.* Ordinance 22 requires any person who desires to construct a large livestock confinement feeding facility to obtain a "notice of construction or operation" before construction or operation of the facility commences.[2] The owner or operator of the proposed facility must file a completed application with the Humboldt County auditor containing the following information: (1) a blueprint of the facility; (2) a statement of manure management, including a manure disposal plan; (3) the parties who will supervise the construction and initial operation of the facility; (4) a plan for runoff management; (5) identification of agricultural drainage tile lines and the remedial measures to be taken to protect their integrity; and (6) identification of agricultural drainage wells, natural sinkholes, artificial open drainage ditches, ponds, streams, lakes, marshlands, and quarries that may be affected by the new building.

The auditor is required to forward the application to the Humboldt County environmental protection officer. If the application is complete, the environmental protection officer conducts an independent investigation to ensure the proposed facility "complies with all applicable statutes, ordinances, and regulations." Once the environmental protection officer concludes the facility complies, the application is forwarded to the county board of supervisors; at the same time, neighboring property owners are also informed of the pending application. After a thirty-day period for public comment, the

1. The term "large livestock confinement feeding facility" is defined identically in all four ordinances:

"Large Livestock Confinement Feeding Facility" means a livestock feeding operation in which the animal weight capacity is:
a) for cattle, more than 500,000 pounds
b) for swine, more than 300,000 pounds
c) for chickens, more than 300,000 pounds
d) for turkeys, more than 500,000 pounds
and where the livestock are or can be confined to areas which are totally roofed.

2. Although the ordinance labels the document issued by the county a "notice," we refer to it in our opinion as a permit. This name more appropriately describes the function of this document because one may not construct or operate a regulated facility *unless* the county has issued a "notice." *See Webster's Third New International Dictionary* 1683 (unabr. ed.1993) (defining "permit" as "**1:** a written warrant or license granted by one having authority <a building ˜> <a work ˜> <a fishing ˜> **2:** PERMISSION, ALLOWANCE <had their ˜to proceed>").

board must issue a permit if the requirements of the ordinance have been satisfied.

Any person who begins construction or operation of a regulated facility without the required permit is guilty of a county infraction punishable by a civil penalty of not more than $100 for each day the person is in violation of the ordinance. In addition, the ordinance provides the county may seek relief under Iowa Code section 331.307 (1995).[3] Section 331.307 allows the court, in any action for a county infraction, (1) to order the defendant to abate or cease the violation, or (2) to authorize the county to abate or correct the violation, with the costs of such abatement or correction assessed against the defendant. *See* Iowa Code § 331.307(9)(c)-(e).

2. *Ordinance 23—financial assurance.* This ordinance provides that "no person shall operate any large livestock confinement feeding facility within Humboldt County without first providing to the [b]oard [f]inancial [a]ssurance as required under this [o]rdinance." The financial assurance required by ordinance 23 may be in the form of a surety bond, insurance, or self-insurance. The mechanism chosen must insure that funds necessary to meet the costs of cleanup and remediation for on-site and off-site contamination are available when needed. The ordinance provides a formula for calculating the projected cleanup and remediation costs. The penalties for violation of ordinance 23 are the same as specified in ordinance 22.[4]

3. *Ordinance 24—groundwater protection.* This ordinance applies to large livestock confinement feeding operations that apply livestock manure on land. It provides, in part:

No person whose facility is subject to this [o]rdinance shall land apply livestock manure on any land in Humboldt County that drains into an agricultural drainage well or sinkhole in a manner that results in the contamination of groundwater.

In addition to this prohibition, ordinance 24 requires that a regulated facility obtain from the county's environmental protection officer a permit to apply livestock manure on land draining into agricultural drainage wells or sinkholes.

The ordinance also provides that the county will annually test such wells and sinkholes to ensure they have not been contaminated by livestock manure. If contamination occurs, the facility's permit for land application of livestock manure is automatically suspended. Any person who land applies livestock manure without the required permit is guilty of a county infraction with the same penalties and relief provided in ordinance 22.

4. *Ordinance 25—toxic air emissions.* Article one of ordinance 25 prescribes the minimum distance that regulated facilities may be located from any residence, other facility, or public use area "if the regulated facility is not able to confine toxic air emissions on site." Article two prohibits regulated facilities from any off-site emission of hydrogen sulfide concentrations in excess of a specified level. If emissions exceed this level, the facility owner or operator must redesign the project, add abatement equipment, or close the facility. The penalties for violation of this ordinance mirror those of the other ordinances.

B. *The lawsuit.* This litigation is the consolidation of two actions for declaratory judgment that challenged the county's ordinances. One action was brought by the Humboldt County Livestock Producers and several of its members against the county, the board of supervisors, the individual board

---

3. These actions were filed on August 29, 1996 and October 30, 1996. Consequently, they are governed by the 1995 Code, as amended by the general assembly in 1995 and 1996. Pertinent amendments, including those found in 1995 Iowa Acts chapter 195, an act providing for the regulation of animal feeding operations, are now codified in the 1997 Code. For simplicity, all references to the Iowa Code in the remainder of this opinion will be to the 1997 Code, unless otherwise indicated. This manner of citation will avoid the necessity to cite to the session laws, and will provide a current and more useful reference to the applicable statutes.

4. As noted earlier, ordinance 22 incorporates the remedies provided by Iowa Code § 331.307. Ordinances 23, 24 and 25 actually cite to Iowa Code § 333.307, a repealed code section dealing with auditors. We assume the references to chapter 333 are typographical errors, and the references were intended to be to chapter 331.

members, and the county zoning administrator, who also serves as the county's environmental protection officer. A second action against the county and the zoning administrator was filed by Lloyd Goodell, Dennis Goodell and Scott Goodell, residents of Humboldt County who planned to construct hog confinement facilities falling within the ordinances' definition of "large livestock confinement feeding operation."[5] Both actions sought a declaratory judgment from the district court that the challenged ordinances were invalid and violated the plaintiffs' constitutional rights.

The ruling from which this appeal was taken resulted from the parties' cross-motions for summary judgment on the question of the county's authority to adopt the ordinances. (The constitutional claims were reserved for later consideration by the court.) The district court concluded that article one of ordinance 25, imposing minimum distances between regulated facilities and other facilities, residences and public use areas, constituted zoning of land and buildings used for agricultural purposes. The court ruled this part of ordinance 25 violated Iowa Code section 335.2, which prohibits counties from zoning agricultural land and structures. As a consequence, the court declared article one of ordinance 25 invalid, and granted summary judgment to the plaintiffs as to this provision.

The district court ruled ordinances 22, 23, and 24 were valid exercises of the county's home rule authority. Although the court also upheld article two of ordinance 25, the court concluded it was unenforceable until the county had complied with Iowa Code section 455B.145.[6] See Iowa Code § 455B.145 (requiring local governmental entities to obtain a certificate of acceptance from the Department of Natural Resources for any local air pollution control program). Accordingly, the court granted summary judgment to the county with respect to these ordinances, with the limitation noted as to ordinance 25.

In response to all parties' motions for an enlargement of the court's findings pursuant to Iowa Rule of Civil Procedure 179(b), the court issued an order holding that its ruling was dispositive of all issues in the Livestock Producers' case. As for the Goodells' suit, the court held that its summary judgment ruling pertained only to the validity of the ordinances and that all other issues not addressed were reserved for future proceedings.

The plaintiffs appealed the district court's summary judgment ruling. Because that ruling was not final as to the Goodell plaintiffs, we granted permission for an interlocutory appeal. The county did not appeal the trial court's adverse rulings with respect to ordinance 25.

## II. Scope of Review.

We will uphold a summary judgment "when the moving party shows no genuine issue of material fact exists and it is entitled to judgment as a matter of law." C–Thru Container Corp. v. Midland Mfg. Co., 533 N.W.2d 542, 544 (Iowa 1995) (citing Iowa R. Civ. P. 237(c)). Thus, on appeal, "we must decide (1) whether a genuine issue of material fact exists, and (2) if the law was correctly applied." Hegg v. Hawkeye Tri–County REC, 512 N.W.2d 558, 559 (Iowa 1994).

In this case, the parties agree there is no dispute with respect to material facts; the disagreement centers on the interpretation of state laws and the effect of those laws on the county's authority to regulate livestock confinement operations. Our role is simply to decide whether we agree with the district court's application of the law to the undisputed facts before us. Therefore, our review is at law. See City of Clinton v. Sheridan, 530 N.W.2d 690, 692 (Iowa 1995).

## III. Home Rule Authority and Preemption.

■ In deciding the validity of the county's ordinances, we must consider two con-

---

5. We will refer to the defendants in both lawsuits jointly as "the county." Any reference to the Livestock Producers includes the individual plaintiffs in that lawsuit. For convenience, any reference to "the plaintiffs" includes all named plaintiffs in both actions.

6. All further references in this opinion to ordinance 25 relate to article two of that ordinance unless the context indicates otherwise.

cepts: (1) the county's home rule authority, and (2) the state's power to abrogate or preempt local action. These concepts and their interrelationship are set forth in Iowa's constitutional grant of county home rule authority. *See* Iowa Const. art. III, § 39A (added by amend. 37 in 1978). Under this constitutional amendment, counties have the power "to determine their local affairs and government," but only to the extent those determinations are "not inconsistent with the laws of the general assembly." *Id.*[7] The goal of this amendment was to grant counties "power to rule their local affairs and government subject to the superior authority of the general assembly." *Sheridan,* 530 N.W.2d at 693 (*citing Bechtel v. City of Des Moines,* 225 N.W.2d 326, 332 (Iowa 1975)).

■ A. *County home rule authority.* The constitutional parameters of county home rule are echoed in chapter 331 of the Iowa Code. Section 331.301 sets forth the general scope of a county's power and its limitations:

> A county may, except as expressly limited by the Constitution, and if not inconsistent with the laws of the general assembly, exercise any power and perform any function it deems appropriate to protect and preserve the rights, privileges, and property of the county or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents.

Iowa Code § 331.301(1). Pursuant to this provision, counties now have the authority to act "unless a particular power has been denied them by statute." *City of Des Moines v. Master Builders of Iowa,* 498 N.W.2d 702, 703–04 (Iowa 1993).

■ The concept of home rule envisions the possibility that state and local governments will regulate in the same area:

> A county shall not set standards and requirements which are lower or less stringent than those imposed by state law, but may set standards and requirements which

are higher or more stringent than those imposed by state law, unless a state law provides otherwise.

Iowa Code § 331.301(6); *see* Sam F. Scheidler, *Implementation of Constitutional Home Rule in Iowa,* 22 Drake L.Rev. 294, 313 (1973) (interpreting comparable provision in chapter 364, dealing with city home rule authority, as the legislature's recognition "that the city and state will often be legislating in the same area") [hereinafter *Home Rule in Iowa* ]. Thus, subject to this restriction and principles of preemption, a county may exercise its home rule powers on matters that are also the subject of state law. *See Decatur County v. PERB,* 564 N.W.2d 394, 398 (Iowa 1997); *Sioux City Police Officers' Ass'n v. City of Sioux City,* 495 N.W.2d 687, 694 (Iowa 1993).

B. *Preemption.* Preemption may be express or implied. Both forms of preemption find their source in the constitution's prohibition of the exercise of a home rule power "inconsistent with the laws of the general assembly." Iowa Const. art. III, § 39A; *see Home Rule in Iowa,* 22 Drake L.Rev. at 305 ("That home rule power must not be inconsistent with the laws of the General Assembly raises a pre-emption problem."). Chapter 331 further defines this limitation: "An exercise of a county power is not inconsistent with a state law unless it is irreconcilable with the state law." Iowa Code § 331.301(4).

■ 1. *Express preemption.* Express preemption occurs when the general assembly has specifically prohibited local action in an area. *E.g., Chelsea Theater Corp. v. City of Burlington,* 258 N.W.2d 372, 373 (Iowa 1977) (holding state has expressly proscribed local regulation of obscene materials). Obviously, any local law that regulates in an area the legislature has specifically stated cannot be the subject of local action is irreconcilable with state law.

---

**7.** Article III, section 38A of the Iowa Constitution, added by amendment 25 in 1968, gives cities home rule authority subject to the same limitation. With respect to the issues before us in this case, we find interpretations of this constitutional provision authoritative on our interpretation of county home rule authority. Therefore, throughout this opinion, we cite to county home rule cases and city home rule cases interchangeably.

■ 2. *Implied preemption.* Implied preemption occurs in two ways. When an ordinance " 'prohibits an act permitted by a statute, or permits an act prohibited by a statute,' " the ordinance is considered inconsistent with state law and preempted. *City of Des Moines v. Gruen,* 457 N.W.2d 340, 342 (Iowa 1990) (quoting *City of Council Bluffs v. Cain,* 342 N.W.2d 810, 812 (Iowa 1983)).

■ Implied preemption may also occur when the legislature has "cover[ed] a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law." *Cain,* 342 N.W.2d at 812; *see also* 5 Beth A. Buday & Victoria A. Braucher, *McQuillin Municipal Corporations* § 15.20, at 109 (3d ed. 1996 rev. vol.) ("Where the state has preempted the field, local law regulating the same subject is inconsistent with the state's transcendent interest, whether or not the terms of the local law actually conflict with the statewide legislation.") [hereinafter 5 *McQuillin Municipal Corporations* ]. "[T]he mere fact that the legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted." 5 *McQuillin Municipal Corporations* § 15.20, at 107. As we discuss in greater detail below, Iowa law requires some legislative expression of an intent to preempt home rule authority, or some legislative statement of the state's transcendent interest in regulating the area in a uniform manner. This approach is consistent with the legislature's statement in chapter 331 that "[a] county may exercise its general powers subject *only* to limitations *expressly imposed* by a state law." Iowa Code § 331.301(3) (emphasis added); *accord Gruen,* 457 N.W.2d at 343 ("Limitations on a municipality's power over local affairs are not implied; they must be imposed by the legislature.").

We turn now to the specific issues before us in this appeal.

*IV.* *Issues on Appeal.*

The plaintiffs claim the trial court incorrectly ruled that the ordinances adopted by Humboldt County were within its home rule authority. They claim the ordinances are invalid for several reasons: (1) the ordinances regulate a matter of statewide concern, which is beyond the county's authority over "local affairs"; (2) the ordinances violate the prohibition of local zoning of agricultural land and structures found in section 335.2; (3) the comprehensive nature of state regulation of animal feeding operations indicates the legislature intended to preempt local government from regulating in this area; and (4) the ordinances directly conflict with state statutes and rules.[8]

As we summarize the issues before us in this case, we think it important also to identify the issues that are *not* before us. This distinction—between issues that we must decide and issues we cannot decide—is rooted in the different roles played by the legislative and judicial branches in our system of government. The chief characteristic of the legislative function is the determination of broad policies or principles for the conduct of society's affairs. *See* 1 Norman J. Singer, *Sutherland Statutory Construction* § 1.03, at 5 (5th ed. 1994). These legislative statements of principles and policies are known as statutes. *See id.* The judicial branch, in reviewing legislative action, has the authority to determine whether the legislature's enactments are constitutional and valid. *See id.* § 2.01, at 15. A court cannot refuse to enforce a statute on the ground that it is unwise. *See id.; see also Hines v. Illinois Cent. Gulf R.R.,* 330 N.W.2d 284, 289 (Iowa 1983) ("In construing statutes it is our duty to determine legislative intent; the wisdom of the legislation is not our concern.").

With this background in the distinctive and different roles of the legislature and the courts with respect to statutory law, we now turn to the case before us. In this matter of public interest, our court is limited to deter-

---

8. The Livestock Producers also claim the district court erroneously considered affidavits offered by the county. This claim was first raised in the Livestock Producers' reply brief. Therefore, we will not consider it on appeal. *See Sun Valley*

*Iowa Lake Ass'n v. Anderson,* 551 N.W.2d 621, 642 (Iowa 1996) ("Parties cannot assert an issue for the first time in a reply brief. When they do, this court will not consider the issue.").

mining whether Humboldt County had the *authority* to enact the challenged ordinances. The *wisdom* of those ordinances is not before us. Nor is it our role to decide whether local government *should* be allowed to regulate livestock confinement operations. The question before us is simply whether, under the constitution and state law, the county *can* regulate in this area.

### V. Home Rule Authority—Do the Ordinances Regulate a "Local Affair"?

The plaintiffs contend that the regulation of livestock confinement feeding operations is a matter of statewide concern. They conclude, therefore, that these operations are not a "local affair" as contemplated by the home rule amendment. *See* Iowa Const. art. III, § 39A (giving counties home rule authority and power "to determine their local affairs and government"). We reject this assertion. Ensuring that livestock operations within a county are conducted in such a manner as to avoid contamination of the environment and interference with others' enjoyment and use of their property is a matter of local concern and, therefore, is a "local affair" within the meaning of the home rule amendment.

A local matter may, however, also have statewide importance. *See* 2 Dennis Jensen & Gail A. O'Gradney, *McQuillin Municipal Corporations* § 4.85, at 203 (3d ed. 1996 rev. vol.). Consequently, characterizing the subject of the challenged ordinances as a local affair does not prevent the legislature from imposing uniform regulations throughout the state, should it choose to do so, nor does it prevent the state from regulating this area in such a manner as to preempt local control. *See id.* We turn now to an examination of whether the state has, indeed, preempted local authorities from regulating livestock feeding operations.

### VI. Express Preemption—Do the Ordinances Constitute Invalid County Zoning of Agricultural Land and Structures?

A. *County zoning authority.* Iowa Code chapter 335 establishes general zoning authority for counties, the scope of such authority, and the procedures for exercising that authority. *See generally* Iowa Code ch. 335. One limitation on the county's zoning power is the express preemption of county zoning of agricultural land and structures:

> [N]o ordinance adopted under this chapter applies to land, farm houses, farm barns, farm outbuildings or other buildings or structures which are primarily adapted, by reason of nature and area, for use for agricultural purposes, while so used.

*Id.* § 335.2. Although the act containing this provision did not state the purpose of the exemption, a predecessor bill having the same exemption asserted that the agricultural exception to county zoning was "intended as a protection for the farmer and his investment in his land." H.F. 426, 1947 H.J. 587 (comments and explanation); *see* Note, *County Zoning in Iowa*, 45 Iowa L.Rev. 743, 754 (1960); *see also* Neil D. Hamilton, *Freedom to Farm! Understanding the Agricultural Exemption to County Zoning in Iowa*, 31 Drake L.Rev. 565, 574 (1981–82) ("the exemption of section 358A.2 [now section 335.2] was a significant statement of the 'freedom to farm' ").

The parties agree the ordinances enacted by Humboldt County apply to land and structures used for agricultural purposes. *See Kuehl v. Cass County*, 555 N.W.2d 686, 689 (Iowa 1996) (holding hog confinement facility was exempt from county zoning regulations under section 335.2). The fighting issue is whether any of the ordinances constitute an "ordinance adopted under ... chapter [335]"; in other words, are the ordinances zoning regulations?

B. *Procedure of adoption.* The county asserts the ordinances were enacted pursuant to the home rule authority granted in chapter 331 and not pursuant to the zoning power granted in chapter 335. The county points out it did not consult its comprehensive plan prior to enactment of the challenged ordinances nor did it follow the other procedures outlined in chapter 335. *See* Iowa Code §§ 335.6–.17. But chapter 331 mandates that any zoning power "shall be exercised in accordance with chapter 335." *Id.* § 331.304(6). This provision makes it

clear that a county does not have a choice to enact an ordinance under chapter 331 *or* chapter 335. If the regulation constitutes zoning, the county must follow the procedures and be subject to the limitations of chapter 335. *See Thompson v. Hancock County,* 539 N.W.2d 181, 183 (Iowa 1995) (holding agricultural exemption is incorporated into zoning regulations enacted under home rule authority of chapter 331). Consequently, a county may not avoid the agricultural exemption simply by labeling a zoning ordinance an exercise of home rule authority and ignoring the procedural requirements of chapter 335. *See Land Acquisition Servs., Inc. v. Clarion County Bd. of Comm'rs,* 146 Pa.Cmwlth. 293, 605 A.2d 465, 469 (1992) ("[T]he stated intent of a municipality is not controlling with respect to the question of whether the substance of an ordinance renders it a zoning ordinance.").

C. *Purpose of ordinances.* That brings us to another argument made by the county to support its position that the challenged ordinances are not zoning regulations. The county points out the purpose of the ordinances is not to regulate land usage, but "to create safeguards to protect the integrity of environmental resources in Humboldt County from potential hazards resulting from permitted acts," and to protect "the health, safety and welfare of Humboldt County residents." Accordingly, it contends, the ordinances are an exercise of the county's police power. *See Gravert v. Nebergall,* 539 N.W.2d 184, 186 (Iowa 1995) (stating the police power is the authority "to pass laws that promote the public health, safety, and welfare").

But the purpose of the regulations does little to assist us in classifying them as the exercise of general police power or the exercise of zoning power. Indeed, any zoning regulation is, by definition, an exercise of the county's police power. *See Montgomery v. Bremer County Bd. of Supervisors,* 299 N.W.2d 687, 692 (Iowa 1980) ("Zoning decisions are an exercise of the police power to promote the health, safety, order and morals of society."); *see also* Iowa Code § 335.5 (stating one objective of zoning is "to protect health and the general welfare"). Conse-

quently, the county's goal of protecting its natural resources and citizens from the unwanted effects of confinement operations is as consistent with the exercise of zoning power as it is with an exercise of the county's home rule authority.

D. *What constitutes zoning under chapter 335?* If the label placed on these ordinances and the purpose for which they were enacted do not assist us in determining whether they are prohibited zoning regulations, what is the test? We think we must necessarily start with the wording of the statute itself to interpret the scope of chapter 335. *See Collins v. King,* 545 N.W.2d 310, 312 (Iowa 1996) ("In interpreting a statute we necessarily begin with the statute's language.").

The zoning power of the county regulated by chapter 335 is described in the statute itself:

> Subject to section 335.2, the board of supervisors may by ordinance regulate and restrict the height, number of structures, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and *use of buildings, structures, and land for trade, industry, residence, or other purposes,* and may regulate, restrict, and prohibit the use for residential purposes of tents, trailers, and portable or potentially portable structures.

Iowa Code § 335.3 (emphasis added). The statute further provides that the board "may divide the county ... into districts ... and *within such districts* it may regulate and restrict the erection, *construction,* reconstruction, alteration, repair, or *use of buildings, structures or land.*" *Id.* § 335.4 (emphasis added). The statute requires that any regulation adopted pursuant to chapter 335 advance certain enumerated objectives, including "to protect health and the general welfare." *Id.* § 335.5.

Based on this statute, the plaintiffs argue any county ordinance that regulates the "use" of buildings or land to protect the public's health or general welfare is zoning. The county responds that the challenged ordinances do not constitute zoning because

they do not regulate land usage *by district.* It points out the challenged ordinances regulate an activity and apply uniformly across the county, irrespective of district classifications.[9] We think the county's understanding of the distinction between a zoning power and a general police power with respect to the regulation of an activity on land is correct.[10]

Historically, zoning regulations took the form of separating geographic areas according to zoning districts and specifying the uses permitted in each district. *See* 1 Patrick J. Rohan, *Zoning and Land Use Controls* § 1.02[1], at 1–6 (1991) [hereinafter *Zoning and Land Use Controls* ]. Zoning has expanded, however, since its beginnings in the early twentieth century and today's land use regulations are far more flexible and complex. *See* 6 *Zoning and Land Use Controls* § 40.01[1][b], at 40–5; *see also Plaza Recreational Ctr. v. Sioux City,* 253 Iowa 246, 249, 111 N.W.2d 758, 761 (1961) (upholding a city zoning ordinance that restricted the types of bowling alleys allowed in a D–1 district to those "which do not permit the consumption of beer or intoxicating liquor on the premises"). Zoning regulations may now take the form of "performance controls" to limit the uses occurring in a particular district. *See* 6 *Zoning and Land Use Controls* § 40A.03[1][b], at 40A–21 to 40A–23 (noting the use of standards for "traffic, noise, dust, odors, or other like problems" to regulate or limit uses).

Despite expansion in the type of regulation imposed by zoning ordinances, the fundamental attribute of use regulation *by district* remains. *See, e.g.,* 83 Am.Jur.2d *Zoning* § 2, at 36 (1992) ("The very essence of zoning is the territorial *division of land into use districts* according to the character of the land and buildings, the suitability of land and buildings for particular uses, and uniformity of use.") (emphasis added); *Black's Law Dictionary* 1618 (6th ed.1990) (defining "zoning,"

in part, as "[d]ivision of land into zones, and *within those zones,* regulation of both the nature of land usage and the physical dimension of uses including height[,] setbacks and minimum area") (emphasis added); 8 J. Jeffrey Reinholtz & Timothy P. Bjur, *McQuillin Municipal Corporations* § 25.07, at 27 (3d ed.1991 rev. vol.) (" 'Zoning' has been defined as the legislative division of a community into areas in which only certain designated uses of land or structures are permitted. The term ... infers governmental regulation of the uses of land and buildings *according to districts or defined areas.*") (emphasis added); *id.* § 25.53, at 172 ("A zoning ordinance is one the nature and purpose of which is to regulate uses of lands and buildings *according to districts, areas, or locations.*") (emphasis added); 1 *Zoning and Land Use Controls* § 1.02[1], at 1–6 ("Zoning ordinances are adopted *to divide the land into different districts,* and to permit only certain uses *within each zoning district.*") (emphasis added); 6 *Zoning and Land Use Controls* § 40.01[1][a], at 40–03 ("The central thesis of zoning is that there is a proper *place* for every use.") (emphasis added).

It is this fundamental attribute that is missing in the challenged ordinances; they regulate an activity irrespective of the location of that activity within the county. Thus, although the ordinances may advance the health and general welfare of the community, they do not do so by regulating the usage of land by district. *See City of Batavia v. Allen,* 218 Ill.App.3d 545, 547, 161 Ill.Dec. 239, 241, 578 N.E.2d 597, 599 (1991) (holding ordinance requiring taverns to close doors and windows during business hours was a licensing restriction and not a zoning provision because "it regulates establishments based on the type of business they conduct, not based on their location"); *Square Lake Hills Condominium Ass'n v. Bloomfield Township,* 437 Mich. 310, 471 N.W.2d 321, 326 (1991) (holding ordinance regulating boat

---

9. We note the county's zoning ordinance purports to restrict the location of confinement agriculture to the A–1 and A–2 districts. The validity of this ordinance in light of section 335.2 is not before us.

10. Our discussion of what constitutes zoning is limited to that concept as applied to use regulation. Zoning regulation may also take the form of physical restrictions on property usage, such as height and area restrictions, and architectural controls. *See* 1 Patrick J. Rohan, *Zoning and Land Use Controls* § 1.02[1], at 1–7 (1991).

docking and launching was not a zoning ordinance because it regulated an activity, and not the use of land and buildings according to districts); *Town of Islip v. Zalak*, 165 A.D.2d 83, 566 N.Y.S.2d 306, 311 (1991) (holding ordinance regulating recycling stations was not a zoning ordinance because it regulated an activity wherever it was carried out).

We note a contrary conclusion would lead to an absurd result. *See Hagen v. Texaco Refining & Mktg., Inc.*, 526 N.W.2d 531, 543 (Iowa 1995) (stating court seeks a reasonable construction of a statute that will "avoid absurd results"). The plaintiffs argue the county's ordinances substantially restrict the use of land and hence are zoning regulations. But that could be said of any regulation of human activity because human activity customarily occurs *on land or in a structure on land. See Town of Islip*, 566 N.Y.S.2d at 311 (noting a law is not a zoning ordinance "merely because it touches the use of land"). Because any regulation of human activity could be characterized as a regulation of the use of one's land, the classification of an ordinance as zoning on the basis that the regulation affects the use of land would make every city or county ordinance a zoning ordinance, subject to the restrictions and procedures of chapter 335.

We are confident the legislature did not intend chapter 335 to have such a broad application. For example, section 335.5 requires that any zoning regulation "be made in accordance with a comprehensive plan" [11] and further that "[s]uch regulations shall be made with reasonable consideration, among other things, as to the character *of the area of the district* and the peculiar suitability *of such area* for particular uses." (Emphasis added.) Additionally, section 335.4 requires that any regulation or restriction must "be uniform for each class or kind of buildings throughout *each district*, but the regulations in one *district* may differ from those in other *districts*." (Emphasis added.) The statute clearly contemplates that land use regulation under chapter 335 will have the fundamental

characteristic of zoning—regulation by district.

We applied this distinction in *Hawkeye Outdoor Advertising, Inc. v. Board of Adjustment*, 356 N.W.2d 544 (Iowa 1984), a case interpreting chapter 414, the city zoning statute. In that case, the plaintiff wanted to erect a twenty-six-foot-high billboard, but the city's sign ordinance limited billboards to twenty feet. *Hawkeye Outdoor Adver.*, 356 N.W.2d at 546. The plaintiff sought a variance from the board of adjustment, but the board declined to act on the basis it had no jurisdiction. *Id.* The question of jurisdiction turned on whether the sign ordinance was a zoning ordinance, subject to variance by the board, or an exercise of the city's general home rule authority. *Id.* We held the sign ordinance was not a zoning ordinance, in part, because it did not "deal with zoning, or restrictions of that sort." *Id.* We characterized a "zoning measure" as one "which regulates the use of property *in designated areas.*" *Id.* (emphasis added).

Because the ordinances adopted by Humboldt County do not regulate land use by district, they are not an exercise of the county's zoning power under chapter 335. Therefore, the ordinances are not subject to the agricultural exemption of section 335.2. We agree with the district court's conclusion that the challenged ordinances are not invalid under chapter 335.

## VII. *Implied Preemption—Has the State Completely Occupied the Field of Livestock Feeding Operations?*

The plaintiffs assert the legislature has so fully and extensively regulated livestock feeding operations that *any* local regulation would be inconsistent with the state regulatory framework. They also argue regulation of animal feeding operations is a matter of statewide concern and should be uniform across the state. Based on the nature of the subject to be regulated, the plaintiffs claim local laws are preempted. In evaluating these arguments, we begin with a review of

---

**11.** A comprehensive plan "has been defined as a general plan to control and direct the use and development of property in a municipality *by dividing it into districts according to the present*

*and potential uses of the property."* 1 *Zoning and Land Use Controls* § 1.02[3][b][iii][A], at 1–19 (emphasis added); *accord Wolf v. City of Ely*, 493 N.W.2d 846, 849 (Iowa 1992).

the guiding legal principles in Iowa on implied preemption.

A. *Applicable analytical framework.* Since the adoption of home rule in Iowa, we have continued to recognize that preemption may occur when the legislature has "cover[ed] a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law." *Cain,* 342 N.W.2d at 812; *accord Gruen,* 457 N.W.2d at 342 ("A municipal ordinance also is preempted by state law when the ordinance invades an area of law reserved by the legislature to itself.") (citing *Cain,* 342 N.W.2d at 812). Although this principle is simple to state, its application is less obvious.

Both parties counsel a broad approach toward ascertaining implied preemption. They suggest that the court consider not only the statutory and regulatory treatment of livestock feeding operations, but also the nature of the issues to be addressed by state and local laws in this area. In essence, they ask the court to make a policy decision as to whether this area *should* be regulated on a statewide basis, rather than to simply decide whether this area *has* been regulated in such a way as to evidence the *legislature's intent* to reserve the area for uniform regulation. The plaintiffs cite several cases from other jurisdictions in which the courts have, in varying degrees, considered the nature of the subject matter being regulated and the need for statewide uniformity as one factor in determining whether there has been an implied preemption of the field. *E.g., Envirosafe Servs. of Idaho, Inc. v. County of Owyhee,* 112 Idaho 687, 735 P.2d 998, 1000 (1987); *Gora v. City of Ferndale,* 210 Mich.App. 622, 533 N.W.2d 840, 842 (1995), *vacated,* 451 Mich. 875, 549 N.W.2d 567 (1996); *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 143 N.W.2d 813, 819–20 (1966); *Halpern v. Sullivan County,* 171 A.D.2d 157, 574 N.Y.S.2d 837, 838 (1991).

 The analytical framework employed in these states cannot, however, be transferred to our state because the home rule statutes in these states do not include provisions similar to those found in Iowa law setting forth the breadth of home rule authority. Although some of these provisions

have been quoted earlier in this opinion, they bear repeating:

1. A county may, except as *expressly* limited by the Constitution, and if not inconsistent with the laws of the general assembly, exercise *any* power and perform *any* function it deems appropriate to protect and preserve the rights, privileges, and property of the county or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents....

. . . .

3. ... A county may exercise its general powers subject *only* to limitations *expressly* imposed by a state law.

4. An exercise of a county power is not inconsistent with a state law unless it is *irreconcilable* with the state law.

. . . .

6. A county shall not set standards and requirements which are lower or less stringent than those imposed by state law, *but may set standards and requirements which are higher or more stringent than those imposed by state law,* unless a state law provides otherwise.

Iowa Code § 331.301; *accord id.* §§ 364.1, .2(2)-(3), .3(3) (governing city home rule). We have consistently endorsed and applied these principles in interpreting Iowa's home rule amendments. *E.g., Decatur County,* 564 N.W.2d at 397–98; *Sheridan,* 530 N.W.2d at 691; *Sioux City Police Officers' Ass'n,* 495 N.W.2d at 693–94; *Gruen,* 457 N.W.2d at 341–42; *Cain,* 342 N.W.2d at 812; *Bryan v. City of Des Moines,* 261 N.W.2d 685, 687 (Iowa 1978). It would be inconsistent with Iowa's county home rule amendment, our home rule statutes and this court's prior cases to imply preemption based on an argument that statewide regulation of an area is preferable to local regulation, in the absence of an expression of legislative intent to completely regulate the area in question. Therefore, we decline the parties' invitation to engage in a wide-ranging analysis of whether statewide regulation of livestock feeding operations is desirable; our role is merely to ascertain whether the *legislature* has demonstrated *its* intention to handle livestock feed-

ing operations exclusively on a statewide basis, or has demonstrated *its* desire that such operations be subjected to uniform regulation across the state.

A brief review of the few cases in which we have considered the theory of subject-wide preemption provides guidance in our analysis of the issue before us in this case. As we noted above, the post-home-rule genesis of this branch of preemption was the *Cain* decision. 342 N.W.2d at 812 (stating legislature may preempt local regulation "by covering a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law"). The local action challenged in *Cain* was a city ordinance requiring anyone who keeps farm animals in the city limits to obtain a permit and pay a licensing fee. *Id.* The defendant, who had been charged with violating this ordinance, claimed the ordinance was preempted by state laws. *Id.* Although we recognized the existence of "extensive state regulations and licensing provisions for farmers who keep or breed livestock," we found no preemption. *Id.*

We reached the same result in *Bryan v. City of Des Moines.* In that case, we upheld local educational requirements for promotion of police officers despite the extensive statutory regulation of civil service employees. *Bryan,* 261 N.W.2d at 686. The court observed that Iowa's civil service law did not "expressly purport to divest" local authorities from imposing additional qualifications on civil service employees seeking promotion. *Id.* at 687. The holding and rationale of the *Bryan* decision was most recently applied and followed in the *Sioux City Police Offi-*

cers' Ass'n case. *See Sioux City Police Officers' Ass'n,* 495 N.W.2d at 694–95 (considering local anti-nepotism policy).

These cases can be helpfully contrasted with an earlier case in which this court held a local ordinance was preempted. This case, *City of Vinton v. Engledow,* 258 Iowa 861, 140 N.W.2d 857 (1966), was the source for the *Cain* court's statement that preemption can be based on the legislature's action in "covering a subject ... in such a manner as to demonstrate [its] intention [to preempt]." *Cain,* 342 N.W.2d at 812. In *City of Vinton,* the court considered whether a local traffic ordinance was preempted by state traffic laws. 258 Iowa at 864–66, 140 N.W.2d at 859–60. The court concluded the local law was preempted because the legislature had indicated its desire for uniformity in this area by stating the following in chapter 321, which deals with rules of the road: " 'The provisions of this chapter shall be applicable and *uniform throughout this state and in all political subdivisions and municipalities therein* and no local authority shall enact or enforce any rule or regulation in conflict with the provisions of this chapter unless expressly authorized herein.' " *Id.* at 865, 140 N.W.2d at 860 (quoting Iowa Code § 321.235 (1962)). We held this expression of legislative intent preempted local action. *Id.* at 867–68, 140 N.W.2d at 861–62.[12]

A comparison of the *City of Vinton* case with *Cain* and *Bryan* illustrates the high degree of expression required of the legislature before this court will find subject-wide preemption. These cases show that extensive regulation of an area is not sufficient in the absence of a clear expression of legisla-

**12.** Although the *City of Vinton* case was decided before constitutional home rule was adopted, it is still helpful to our analysis of home rule authority. That is because prior to the *City of Vinton* decision, the legislature had enacted a statute that modified the traditional rule requiring a strict construction of any statute granting power to local authorities:

No section of the Code which grants a specific power to cities and towns, or any reasonable class thereof, shall be construed as narrowing or restricting the general grant of powers hereinabove conferred *unless such restriction is expressly set forth in such statute or unless the terms of such statute are so comprehensive as to have entirely occupied the field of its subject.*

Iowa Code § 368.2 (1966) (emphasis added) (repealed by 1972 Iowa Acts ch. 1088, § 199); *see also Richardson v. City of Jefferson,* 257 Iowa 709, 716, 134 N.W.2d 528, 532–33 (1965) (interpreting this statute as a modification of the *Dillon* rule, which limited the powers of local government to those expressly granted by the legislature or necessarily implied as incident to those expressly granted). Despite this rule of liberal construction, the court in *City of Vinton* held the rule could not "take precedence over the plain mandate of the legislature that the traffic regulations are to be uniform and consistent with chapter 321." 258 Iowa at 868, 140 N.W.2d at 862.

tive intent to preempt regulation of a field by local authorities, or a clear expression of the legislature's desire to have uniform regulations statewide. Consequently, in this case we look to the statutes and regulations controlling the construction and operation of livestock feeding facilities to determine whether they contain the necessary expression of legislative intent to preclude local regulation.

B. *Application of law to facts.* The plaintiffs rely generally on the extensiveness of the regulations governing animal feeding operations to support their argument that this area has been fully occupied by the legislature. As we have discussed, however, the expansive scope of state regulation is not enough under Iowa law to support a finding of intent to preempt.

More specifically, the plaintiffs cite to three provisions of House File 519, a bill regulating animal feeding operations and recently enacted into law by the general assembly, *see* 1995 Iowa Acts ch. 195, to support their theory of preemption. These three provisions have been codified as (1) Iowa Code section 657.11, limiting nuisance suits against animal feeding operations, (2) Iowa Code section 455B.201, prohibiting groundwater contamination from manure disposal, and (3) Iowa Code section 455B.173(13), authorizing the Environmental Protection Commission to adopt rules relating to the construction or operation of animal feeding operations. None of these statutes, or the regulations promulgated pursuant to them, however, contain an expression of legislative intent to eliminate local home rule authority in the area of livestock feeding operations. Nor do we find any statement that uniformity or statewide regulation is the goal of the general assembly.

 Absent such expressions from the legislature that it has made the policy judgment that local regulation should be precluded, we must apply the home rule principles of our constitution and chapter 331. These principles authorize local regulation *unless* local action conflicts with state law or otherwise is contrary to the principles of home rule power set forth in chapter 331 and the Iowa Constitution. We turn now to an exam-

ination of each ordinance to determine whether it conflicts with state statutes or regulations.

VIII. *Implied Preemption—Are the Ordinances Inconsistent With State Law?*

 A. *General principles.* As noted above, a county's exercise of home rule power cannot be "inconsistent with the laws of the general assembly." Iowa Const. art. III, § 39A; *accord* Iowa Code § 331.301. Thus, the constitutional grant of home rule power is "carefully qualified so as to withhold the grant of power where it conflicts with [a] state statute." *Gravert,* 539 N.W.2d at 189. A local ordinance "is not inconsistent with a state law unless it is *irreconcilable* with the state law." Iowa Code § 331.301(4) (emphasis added). A local law is "irreconcilable" with state law when the local law " 'prohibits an act permitted by statute, or permits an act prohibited by a statute.' " *Gruen,* 457 N.W.2d at 342 (quoting *Cain,* 342 N.W.2d at 812). These principles of law are well established in our cases and the parties do not dispute their applicability here.

 In determining what the legislature has permitted and prohibited, we look to the legislative intent in enacting the state statutes and we require that any local ordinance remain faithful to this legislative intent, as well as to the legislative scheme established in the relevant state statutes. *See Master Builders of Iowa,* 498 N.W.2d at 704; *City of Iowa City v. Westinghouse Learning Corp.,* 264 N.W.2d 771, 772–73 (Iowa 1978). In searching for legislative intent, "we are obliged to interpret the state law in such a manner as to render it harmonious with the ordinance," subject of course to our usual rules of statutory interpretation. *Gruen,* 457 N.W.2d at 342. Statutory rules of construction provide that the court, in ascertaining legislative intent, may consider the object sought to be attained by the legislature in enacting the statute and the legislative history of the statute. *See* Iowa Code § 4.6(1), (3).

There is some tension between these general principles and the statutory provision

that a local government may "set standards and requirements which are higher or more stringent than those imposed by state law." Iowa Code § 331.301(6). Any distinction between a local ordinance that is inconsistent with state law and one that merely sets a higher standard or requirement is at best subtle. Nevertheless, we strive to interpret a statute in such a way as to render it in harmony with the constitution, not in conflict with it, *see Patterson v. Iowa Bonus Bd.*, 246 Iowa 1087, 1091–92, 71 N.W.2d 1, 4 (1955); *see also In re Guardianship of Hedin*, 528 N.W.2d 567 (Iowa 1995), because where a conflict exists, the constitution must prevail, *see Patterson*, 246 Iowa at 1091–92, 71 N.W.2d at 4.

■ When a state law merely sets a standard, a local law setting a higher standard would not conflict with the state law and would be authorized under section 331.301(6). This concept is most easily illustrated by our cases dealing with civil service employees. This court has consistently held that the examinations for civil service employees established in Iowa Code chapter 400 are not the exclusive criteria for employment or promotion. *See Sioux City Police Officers' Ass'n*, 495 N.W.2d at 694; *Bryan*, 261 N.W.2d at 687. We have interpreted chapter 400 as providing that civil service commissions have sole authority to give entrance and promotional exams, but chapter 400 does not give such commissions exclusive authority to establish qualifications for employment or promotion. *See Sioux City Police Officers' Ass'n*, 495 N.W.2d at 694; *Bryan*, 261 N.W.2d at 687. Notably, chapter 400 contains no statement that successful completion of a civil service examination confirms that one is qualified for the job one seeks.

In contrast to these civil service cases are two cases involving challenges to local ordinances implementing Iowa's discrimination statute, Iowa Code chapter 601A (now codified at Iowa Code chapter 216). *See City of Iowa City*, 264 N.W.2d at 773; *Cedar Rapids Human Rights Comm'n v. Cedar Rapids Community Sch. Dist.*, 222 N.W.2d 391, 402 (Iowa 1974). In these cases, the court held that Iowa Code section 601A.12 (1973) allowed municipalities to create a commission to deal with local complaints of discriminatory conduct under chapter 601A. *City of Iowa City*, 264 N.W.2d at 772; *Cedar Rapids Human Rights Comm'n*, 222 N.W.2d at 398–99; *see also* Iowa Code § 601A.12 (1973) (now codified at Iowa Code § 216.19 (1997)). We noted, however, both section 601A.12 and the city home rule amendment required that any local law be consistent with state statutes. *City of Iowa City*, 264 N.W.2d at 773; *Cedar Rapids Human Rights Comm'n*, 222 N.W.2d at 398. We concluded the local ordinances were inconsistent with chapter 601A and invalid because they did not follow the statutory scheme established in that chapter. *City of Iowa City*, 264 N.W.2d at 773 (invalidating a local ordinance that did not provide for an administrative determination of the existence of a discriminatory practice); *Cedar Rapids Human Rights Comm'n*, 222 N.W.2d at 402–03 (holding local ordinance invalid because it did not provide for judicial review of administrative determination of discrimination).

Another situation that could give rise to inconsistent local laws is one where the state has conditioned pursuit of an activity upon compliance with certain requirements. Any attempt by a local government to add to those requirements would conflict with the state law, because the local law would in effect prohibit what the state law permits. *E.g., Perdue Farms, Inc. v. Hadder*, 109 Md.App. 582, 675 A.2d 577, 581 (1996) (holding local restriction on irrigation spraying of wastewater from poultry processing facility conflicted with state permit allowing such spraying); *Board of Supervisors v. ValAdCo*, 504 N.W.2d 267, 272 (Minn.Ct.App.1993) (holding ordinance requiring a township permit for operation of a feedlot conflicted with state statutes providing for state-issued permit). Stated another way, the local ordinance would prohibit an activity absent compliance with the additional requirements of local law, even though under state law the activity would be permitted because it complied with the requirements of state law. In this situation, the local regulation would be inconsistent with state law and preempted.

Although it is possible to reconcile the statute allowing counties to set higher standards with the prohibition against inconsis-

tent local laws, any distinction between these two principles is not determinative here. As we show in the following discussion, the Humboldt County ordinances do far more than merely set more stringent standards to regulate confinement operations. These ordinances revise the state regulatory scheme and, by doing so, become irreconcilable with state law. We turn now to an analysis of the Humboldt County ordinances.

B. *Ordinance 22.* Ordinance 22 requires a permit from the county before construction or operation of a large livestock confinement facility may commence. The county will not issue a permit unless the applicant has complied "with all applicable statutes, ordinances, and regulations." The plaintiffs claim this ordinance conflicts with Iowa Code section 455B.110 and the permit requirements of the Department of Natural Resources (DNR).

■ 1. *Section 455B.110.* This statute prevents the DNR from pursuing an enforcement action against an animal feeding operation [13] without prior approval from the Environmental Protection Commission, unless it seeks to enforce a civil penalty of three thousand dollars or less. *See* Iowa Code § 455B.110. Although chapter 455B allows persons other than the DNR to commence a civil action against any person claimed to be in violation of chapter 455B, this right is restricted. *See id.* § 455B.111. The person commencing the action must be "adversely affected by the alleged violation." *Id.* § 455B.111(3). More importantly, the person seeking to commence suit must give sixty days written notice to the director of the DNR and the alleged violator, specifying the violation and that legal action is contemplated if the violation is not abated. *See id.* § 455B.111(2). No action may be commenced if the DNR or the state is actively prosecuting a civil action against the alleged violator or is actively negotiating an out-of-court settlement. *See id.*

We agree with the plaintiffs that the ordinance is inconsistent with these statutory provisions. Ordinance 22 creates a right in the county to abate a violation of state law by making compliance with state law a condition of obtaining a permit for construction or operation of a confinement facility. If a facility is operated in violation of state law and consequently without the required county permit, the county can bring a civil action to enjoin operation. The ordinance does not require the county to obtain the commission's prior approval nor is the county required to give the DNR and the violator notice of its intent to file an action if the violation is not abated. Thus, the ordinance allows the county to do indirectly what the statute directly forbids.[14] The statute and ordinance are irreconcilable in this respect. Additionally, the ordinance is not faithful to the enforcement scheme established by chapter 455B. Therefore, we conclude the permit requirement of the county ordinance is invalid.

■ 2. *Section 455B.173(13).* The legislature has specifically invested the Environmental Protection Commission with the authority to adopt rules "relating to the construction or operation of animal feeding operations," including, but not limited to, "minimum manure control requirements, requirements for obtaining permits, and department evaluations of animal feeding operations." *Id.* § 455B.173(13). The legislature exempted small animal feeding operations from the construction permit requirement. *See id.* Nevertheless, operations not subject to the permit requirement may obtain a permit upon filing an "application meet[ing] standards established by the [DNR]." *Id.* Within these parameters, the DNR has provided by rule that certain animal feeding operations must obtain construction and operation permits. *See* Iowa Admin. Code rr. 567—65.3–.6 (1997). An applicant must

---

13. The term "animal feeding operation" is defined to include "a lot, yard, corral, building, or other area in which animals are confined and fed and maintained for forty-five days or more in any twelve-month period...." Iowa Code § 455B.161(3); *accord* Iowa Admin. Code r. 567—65.1(3) (1997).

14. Although the limitations on a civil suit imposed by § 455B.111(5) do not restrict any rights under "statutory or common law," the county's right to bring suit is based on violation of a *county ordinance,* not a statute or the common law.

submit a copy of the application to the county board of supervisors in the county where the facility is to be located. *See* Iowa Code § 455B.173(13); Iowa Admin. Code r. 567—65.9(1). The DNR is required to consider the county's comments concerning the applicant's compliance with state statutes and regulations prior to issuing a permit. *See* Iowa Code § 455B.173(13); Iowa Admin. Code r. 567—65.9(2).

The Minnesota Court of Appeals considered preemption under similar circumstances in the *ValAdCo* case. In *ValAdCo*, a local township adopted an ordinance that required anyone who wanted to operate an animal feedlot or livestock sewage lagoon to obtain a permit from the township. 504 N.W.2d at 269. As a condition of issuing the permit, the applicant had to comply with the ordinance's waste disposal guidelines and setback distances, and had to file a surety bond or cash with the township. *Id.* at 270. The defendant, ValAdCo, obtained the necessary county and state permits for two hog confinement centers. *Id.* at 269. When ValAdCo began construction of the facilities, however, the township sought injunctive relief for ValAdCo's failure to comply with the township's ordinance. *Id.*

The Minnesota Court of Appeals held the state had completely occupied the field of animal feedlots, thereby preempting local regulation. *Id.* at 270–71. Notwithstanding this conclusion, the court went on to consider whether the township's permit requirement conflicted with state statutes that also established a procedure for the issuance of a permit. *Id.* at 272. The Minnesota test for a conflict was nearly identical to that applied in Iowa: "a local ordinance is invalid only if the express and implied terms of the ordinance and the state statute are irreconcilable." *Id.* The court held an irreconcilable conflict existed between the township's ordinance and the state permit requirement because the

different requirements of the ordinance meant that construction of a facility that would be permissible under state law would be prohibited under the ordinance. *Id.* (dicta). It also pointed out that ValAdCo could be in compliance with the state requirements yet be prosecuted under the local ordinance. *Id.* (dicta).[15]

A similar conclusion is warranted here. Because ordinance 22 conditions construction and operation of any large confinement operation upon filing an application and obtaining a permit, we think the ordinance is inconsistent with state law. For example, assume an operation meets state law requirements, but not the county's additional requirements. Under these circumstances, the state rules would allow construction and operation of the facility, but the county ordinance would prohibit it because the operation would not have met the additional requirements of the county's ordinances. The county ordinance would prohibit what the state law would allow. Therefore, ordinance 22 conflicts with the state permit requirement and standards and is invalid.

We think the ordinance also conflicts with the limited role envisioned by the legislature for the county in the permitting process. The county's role is well-defined under chapter 455B; the county may comment on the proposed facility's compliance with state law. Although the DNR considers the county's comments, chapter 455B places the decision-making authority with the DNR. In contrast, ordinance 22 elevates the county's role by allowing the county to determine whether the applicant has complied with state law and making operation or construction of a facility contingent on the *county's* decision to issue a permit. These conflicts are irreconcilable and invalidate ordinance 22. *See City of Iowa City*, 264 N.W.2d at 773 (holding municipal ordinance conflicted with state law

---

**15.** The county relies on a more recent case decided by the Minnesota Court of Appeals, *Blue Earth County Pork Producers, Inc. v. County of Blue Earth*, 558 N.W.2d 25 (Minn.Ct.App.1997), in which the court held a *county* ordinance placing conditions on feedlot permits was not preempted. This decision is not pertinent to the case before us, however, because the state statute in *Blue Earth* specifically allowed counties to process animal feedlot permits, including imposing conditions upon the applicant. *See Blue Earth*, 558 N.W.2d at 28. No comparable provision appears in Iowa's statutes or rules. Therefore, the role of counties in Iowa's permitting process is more analogous to the role of townships in the Minnesota permitting process.

and was invalid because it was not "faithful to the legislative scheme").

In summary, ordinance 22 does not merely impose higher standards on livestock confinement operations by adding the county permit requirement to the list of prerequisites for building and operating such a facility. The ordinance actually *changes* the state regulatory system: (1) the county, not the DNR, becomes the decision maker; (2) commission approval is not required for an enforcement action; and (3) notice to the DNR and the violator is not required. We find no meaningful distinction between the effect of this ordinance and those struck down in *City of Iowa City*, 264 N.W.2d at 773, and *Cedar Rapids Human Rights Commission*, 222 N.W.2d at 398. Ordinance 22 is irreconcilable with state law.

██ C. *Ordinance 23.* This ordinance makes the operation of a regulated facility conditional on the posting of financial assurance in an amount sufficient to remedy on-site and off-site contamination resulting from operation of the facility. The plaintiffs allege this ordinance conflicts with chapter 455B and chapter 204. Chapter 204 sets up a manure storage indemnity fund for the purpose "of indemnifying a county for expenses related to cleaning up the site of the confinement feeding operation." Iowa Code § 204.2(1), (3). In addition, as part of the permitting scheme outlined above, an applicant must pay an indemnity fee prior to the issuance of a construction permit. *See id.* § 455B.173(13).

We conclude ordinance 23 suffers from the same infirmity as ordinance 22 because furnishing financial assurance is made a condition of lawful operation of a large livestock confinement center. Consequently, a facility that would be authorized to operate under state law would be prohibited by the county ordinance. Thus, ordinance 23 is irreconcilable with and preempted by state law.

██ D. *Ordinance 24.* Ordinance 24 prohibits the application of livestock manure on land "that drains into an agricultural drainage well or sinkhole in a manner that results in contamination of groundwater." The ordinance also requires anyone applying manure on such land to obtain a permit from the county. The plaintiffs claim these provisions conflict with Iowa Code section 455B.201 and section 455B.172(5). In response, the county asserts the ordinance is specifically authorized by Iowa Code section 455E.10. Because we conclude ordinance 24 conflicts with section 455B.172(5), we limit our discussion to that statute.

Iowa Code section 455B.172(5) provides in relevant part:

The department shall maintain jurisdiction over and regulate the direct discharge to a water of the state....

The department shall by rule adopt standards for the commercial cleaning of private sewage disposal facilities, *including but not limited to* septic tanks and *pits used to collect waste in livestock confinement structures,* and for the disposal of waste from the facilities.... A person shall not commercially clean such facilities or *dispose of waste from such facilities* unless the person has been issued a license by the department. *The department shall be exclusively responsible for adopting the standards and issuing licenses.* However, county boards of health shall enforce the standards and licensing requirements established by the department.

(Emphasis added.) We have previously stated that this section confers jurisdiction on the DNR "to adopt standards ... for the disposal of waste from [livestock confinement] facilities." *DeCoster v. Franklin County*, 497 N.W.2d 849, 853 (Iowa 1993) (dicta). As we noted in *DeCoster*, the responsibility of the DNR to adopt standards and issue licenses for the disposal of waste from confinement facilities is *exclusive. Id.* (dicta).

The statute upon which the county relies to support its authority to regulate manure disposal is found in chapter 455E, which addresses groundwater protection in general. That chapter authorizes state groundwater protection programs "to prevent further contamination of groundwater from any source to the maximum extent possible." Iowa Code § 455E.5; *see id.* § 455E.7. Section 455E.6 specifically provides that "[a]n activity that does not violate chapter 455B does

not violate this chapter." More important to the case before us, local governments "are authorized and encouraged to implement groundwater protection policies within their respective jurisdictions, provided that implementation is at least as stringent but consistent with the rules of the department." *Id.* § 455E.10(2).

We hold there is a direct and irreconcilable conflict between ordinance 24 and section 455B.172(5). The legislature has expressly made the DNR exclusively responsible for regulating the disposal of livestock waste from confinement facilities. Because the legislature did not define the word "exclusive" as used in the statute, we give it its ordinary meaning. *See State v. Crone*, 545 N.W.2d 267, 271 (Iowa 1996) (referring to dictionary for ordinary meaning of word used in criminal statute). The word "exclusive" means "limiting ... control," or "excluding ... others ... from participation." *Webster's Third New International Dictionary* 793 ( unabr. ed.1993). The conclusion is inescapable that the legislature intended that no entity other than the DNR regulate waste disposal from animal confinement facilities.[16]

Furthermore, the general allowance of local groundwater protection policies contained in section 455E.10 does not override the legislature's more specific grant of exclusive jurisdiction to the DNR to regulate livestock waste disposal. *See* Iowa Code § 4.7 (stating where an irreconcilable conflict exists between a general statute and a special statute, the special statute prevails). Consequently, any home rule authority of the county to control the land application of manure from confinement operations has been preempted by the state. Therefore, the county did not have the power to adopt ordinance 24.

E. *Ordinance 25.* Ordinance 25 restricts off-site emissions of hydrogen sulfide from regulated facilities. This ordinance sets a permissible level of emission and requires that any violator of these standards redesign the facility to comply with the ordinance, add abatement equipment, or close the facility. If the violator fails to remedy the violation in one of these ways, the county may seek an order of abatement through a civil action in district court. *See id.* § 331.307(9)(c).

The plaintiffs claim this ordinance conflicts with state laws regulating air quality, animal feeding operations, and anaerobic lagoons. *See id.* §§ 455B.134(3), .161–.165. They also contend it conflicts with Iowa Code section 657.11, which places limitations on nuisance suits against animal feeding operations. We will consider the latter contention first.

1. *Conflict with limitations on nuisance suits.* Chapter 657 is Iowa's nuisance statute. It defines a nuisance, in part, as anything "unreasonably offensive to the senses ... so as essentially to ... unreasonably interfere with the comfortable enjoyment of life or property." *Id.* § 657.1; *see Weinhold v. Wolff,* 555 N.W.2d 454, 461–64 (Iowa 1996) (finding commercial hog feeding and confinement operation a nuisance because it created noxious and offensive odors). Chapter 657 further provides for a civil action to enjoin and abate the nuisance and to recover damages caused by the nuisance. *See* Iowa Code § 657.1.

Section 657.11 places limitations on such actions when filed against animal feeding operations:

2. If a person has received all permits required pursuant to chapter 455B for an animal feeding operation, as defined in section 455B.161, there shall be a rebuttable presumption that an animal feeding operation is not a public or private nuisance under this chapter or under principles of common law, and that the animal feeding operation does not unreasonably and continuously interfere with another person's comfortable use and enjoyment of the person's life or property under any other cause of action. The rebuttable presumption also applies to persons who are not required to obtain a permit pursuant to chapter 455B for an animal feeding operation as defined in section 455B.161....

3. The rebuttable presumption may be overcome by clear and convincing evidence of both of the following:

---

16. The legislature's expression of intent to preclude local action by vesting exclusive responsi-
bility in the State is, perhaps, more accurately characterized as express preemption.

a. The animal feeding operation unreasonably and continuously interferes with another person's comfortable use and enjoyment of the person's life or property.

b. The injury or damage is proximately caused by the negligent operation of the animal feeding operation.

*Id.* § 657.11(2)-(3). This presumption is a defense for any action

arising out of the care and feeding of animals; the handling or transportation of animals; the treatment or disposal of manure resulting from animals; the transportation and application of animal manure; and the creation of noise, odor, dust, or fumes arising from an animal feeding operation.

*Id.* § 657.11(5). The intent of the legislature in placing limitations on nuisance suits against animal feeding operations is clearly set forth in the statute:

The purpose of this section is to protect animal agricultural producers who manage their operations *according to state and federal requirements* from the costs of defending nuisance suits, which negatively impact upon Iowa's competitive economic position and discourage persons from entering into animal agricultural production. This section is intended to promote the expansion of animal agriculture in this state by protecting persons engaged in the care and feeding of animals. The general assembly has balanced all competing interests and declares its intent to protect and preserve animal agricultural production operations.

*Id.* § 657.11(1) (emphasis added).

■ We turn now to the ordinance. Ordinance 25 does not purport to be a nuisance ordinance, although the county's home rule authority clearly includes the power to regulate activities offensive to the senses. *See id.* § 331.384(1)(a) (allowing a county to "[r]equire the abatement of a nuisance, public or private, in any reasonable manner"). The county's failure to expressly classify a violating facility as a nuisance does not end our inquiry, however. We look to the substance of the ordinance, not its label, to determine whether it conflicts with a state statute or regulation. *Cf. Van Baale v. City of Des*

*Moines,* 550 N.W.2d 153, 156 (Iowa 1996) (looking at substance of claim rather than its form or label to determine whether it was preempted by state remedy). An examination of the substance of ordinance 25 and its effect on animal production operations reveals that the ordinance accomplishes the same result as would an ordinance expressly "[r]equir[ing] the abatement of a nuisance." *See* Iowa Code § 331.384(1)(a).

Ordinance 25 regulates odors emanating from confinement operations by setting a limit on off-site "toxic air emissions." It makes an uncorrected violation of the ordinance a county infraction, thereby allowing the county to obtain injunctive relief in a civil action. Consequently, by virtue of ordinance 25, the county can "enjoin and abate" an animal feeding operation, within the meaning of chapter 657, upon a mere showing the operator has failed to comply with the *county's* standards.

In the absence of ordinance 25, a county seeking to close a facility that emitted toxic odors would have to show a violation of *state* law or overcome the rebuttable presumption of section 657.11 by clear and convincing proof that the facility "unreasonably and continuously interferes" with the comfortable enjoyment of life or property *and* that any injury "is proximately caused by the *negligent* operation" of the facility. *Id.* § 657.11(3) (emphasis added). To state the situation another way: section 657.11 prevents an injunction against an animal feeding operation based on odors produced by the operation unless certain conditions are met. Ordinance 25 allows the same relief without requiring the county to meet these conditions. Thus, ordinance 25 permits what the state statute, section 657.11, prohibits.

We hold there is a direct and irreconcilable conflict between the ordinance and section 657.11. As noted earlier, any local ordinance must remain faithful to the legislative intent underlying a state statute. *See Master Builders of Iowa,* 498 N.W.2d at 704; *City of Iowa City,* 264 N.W.2d at 772–73. As one authority states, "the fact that a local ordinance does not expressly conflict with the statute will not save it when the legislative

purpose in enacting the statute is frustrated by the ordinance." 5 *McQuillin Municipal Corporations* § 15.20, at 107. If a local government could avoid the state's limitations on injunctive relief against an animal feeding operation emitting offensive odors simply by passing an ordinance providing for such relief without such limitations, the purpose of the legislature in enacting section 657.11 would be seriously undermined. Thus, ordinance 25 does not remain faithful to the legislature's intent in enacting section 657.11, but rather circumvents the legislature's restrictions on enjoining the operation of livestock confinement facilities that emit offensive odors. By eliminating the negligence component of section 657.11(3), the county allows nuisance relief without the showing mandated by state law. Under these circumstances, it is impossible to credibly characterize ordinance 25 as merely setting a more stringent standard. It constitutes a frontal assault on section 657.11 and, as such, is not a valid exercise of the county's home rule authority.[17]

2. *Effect of chapter 455B.* Although our decision that ordinance 25 conflicts with section 657.11 makes it unnecessary to consider the plaintiffs' contention that the ordinance also conflicts with chapter 455B, it is appropriate to address a potential conflict between section 657.11 and the provisions of chapter 455B. The county points out that chapter 455B specifically authorizes local air pollution control programs. *See* Iowa Code § 455B.144(1) ("Any political subdivision may conduct an air pollution control program within the boundaries of its jurisdiction. . . ."). The term "air pollution" is defined to include the presence of contaminants in the air that "unreasonably interfere[ ] with the enjoyment of life and property," *id.* § 455B.131(3), a definition strikingly similar to the definition of "nuisance," which also includes the element of "unreasonabl[e] interfer[ence] with the comfortable enjoyment of life or property," *id.* § 657.1.

To the extent the general authorization of air pollution programs conflicts with the express and special protection of animal feeding operations afforded by section 657.11, the latter statute must prevail. *See id.* § 4.7 (stating where an irreconcilable conflict exists between a general statute and a special statute, the special statute prevails). Consequently, the county's general power to regulate air quality cannot be used to defeat the state's unique treatment of animal production facilities.

IX. *Summary.*

A. *Zoning exemption.* The ordinances enacted by Humboldt County are not an exercise of the county's zoning power. The ordinances apply to the activity of large livestock confinement feeding operations wherever such operations are located within the county. Therefore, the ordinances lack the essential feature of a zoning ordinance—the regulation of use by district. Because the ordinances are not zoning regulations, the agricultural exemption of chapter 335 does not apply.

B. *Implied preemption of the field of animal feeding operations.* Although the legislature has extensively regulated livestock feeding operations, it has not expressed a desire to prohibit local regulation that does not conflict with state statutes or rules. Therefore, we find no preemption of local authority in the area of animal feeding operations. Furthermore, we reject the parties' suggestion that the court decide whether the state has a pervasive interest in the area to be regulated and whether local regulation would have unreasonable adverse effects on the state as a whole. Consideration of these factors would be contrary to established principles of preemption in Iowa, as mandated by chapter 331. The court may not find preemption of an entire area unless the legislature has expressed its desire for statewide uniformity or has otherwise expressed an intention to preclude local regulation of a complete field.

17. We note that § 657.11 would not prevent the state from enforcing its own laws governing confinement operations. Enforcement of state laws is unaffected because the rebuttable presumption created by § 657.11 does not apply where "the injury to a person or damage to property is proximately caused by a failure to comply with . . . a *state* statute or rule which applies to the animal feeding operation." Iowa Code § 657.11(2) (emphasis added).

C. *Conflict with state laws.* Ordinance 22 (permit requirement) conflicts with section 455B.110 and state laws and rules establishing permit requirements for animal feeding operations. Ordinance 23 (financial assurance) also conflicts with the state's permitting requirements for the operation of livestock confinement facilities. Ordinance 24 (groundwater protection) conflicts with section 455B.172(5), which grants exclusive jurisdiction to the DNR to regulate the disposal of animal wastes from confinement facilities. Finally, ordinance 25 (toxic air emissions) conflicts with section 657.11, which places strict and comprehensive limitations on nuisance suits against animal feeding operations. Consequently, Humboldt County's ordinances are invalid and unenforceable.

D. *Disposition.* We reverse the district court's ruling and remand these consolidated cases to the district court for the entry of summary judgment in favor of the plaintiffs.

**REVERSED AND REMANDED.**

All justices concur except CARTER and NEUMAN, JJ., who concur specially; HARRIS, J., who dissents in part; SNELL, J., who dissents; and McGIVERIN, C.J., and LARSON, J., who take no part.

CARTER, Justice (specially concurring).

I concur in the opinion of the court. I write separately in order to state my views as to why the court has correctly rejected the arguments of the appellees based on Iowa Code section 331.301(6) (1995).

Section 331.301(6) provides:

A county shall not set standards and requirements which are lower or less stringent than those imposed by state law, but may set standards and requirements which are higher or more stringent than those imposed by state law, unless a state law provides otherwise.

The problem of interpretation that arises in the present dispute is how to determine whether "state law provides otherwise" as to the substance of a county regulation.

As to ordinance 24, the applicable state law imposes an express limitation on local regulation in this area. As to ordinances 22, 23, and 25, express limitation on local regulation is not contained in state law, but, as the opinion of the court suggests, such limitations are clearly implied from the nature and scope of the state regulatory scheme. It thus becomes necessary to decide whether implied limitations on local authority may suffice to preclude local regulation.

The appellees urge that in order to stem local regulation any limitation on county power must be expressly stated in a state statute. Our decision in *Bryan v. City of Des Moines,* 261 N.W.2d 685, 687 (Iowa 1978), involving home rule for cities, suggested that limitations on local authority must be expressly imposed. That conclusion was based on Iowa Code section 364.2(2), which states that a city may exercise its general grant of home rule power "subject only to limitations expressly imposed by a state or city law." A similar provision, relating to county home rule, is contained in section 331.301(3) ("county may exercise its general powers subject only to limitations expressly imposed by a state law"). There are, however, other statutes bearing on this issue that were not considered in the *Bryan* case. These statutes suggest that the views expressed in that case concerning the need for express limitation of local authority were incorrect.

The requirement that limitations be "expressly imposed" refers to limitations on general home rule powers. The statutory grant of general home rule powers for counties is contained in section 331.301(1). From the outset, these powers are subject to the proviso that local action pursuant thereto may not be "inconsistent with the laws of the general assembly." Iowa Code § 331.301(1).[1] As a

---

1. There is an identical limitation on the general home rule powers granted to cities in Iowa Code section 364.1. The phrase "not inconsistent with the laws of the general assembly" used in both section 331.301(1) and section 364.1 is the same language employed in the 1968 and 1978 amendments to the Iowa Constitution granting home

rule powers to cities and counties. Iowa Const. art. III, §§ 38A, 39A. Although it may be argued that the legislature may approve a broader grant of authority to cities and counties than that given directly by the constitution, the adoption of the constitutional language in defining the scope of

result, there is no home rule power to enact a local regulation that is inconsistent with state law. The right to impose "more stringent standards" envisioned in section 331.301(6) is necessarily subject to this restriction.

The paramount role of the "inconsistency" standard for limiting home rule, as contrasted with the "express limitation on general powers" language in section 331.301(3) and the "more stringent standards" language in section 331.301(6), is made clear by the inclusion of a definition of the term "inconsistent with a state law." *See* Iowa Code § 331.301(4). If limitations on the grant of home rule authority were limited to express limitation by legislative enactment rather than mere inconsistency with state law, there is no purpose in including that definition.

The legislature has equated inconsistency with irreconcilability.[2] To avoid exalting form over substance the term "irreconcilable" must be interpreted to mean disharmony in result depending on whether a comprehensive state law or a local regulation is applied to a particular situation. Otherwise, the inconsistency standard would be mere words on paper. Viewed in this light, the regulations contained in ordinances 22, 23, and 25 are, as the opinion of the court aptly demonstrates, irreconcilable with state law and beyond the power of the county to enact.

NEUMAN, J., joins in this special concurrence.

HARRIS, Justice (dissenting in part).

Much as I admire the scholarship and careful analysis reflected in the majority opinion, I cannot join in it and dissent in part. The majority is entirely correct in rejecting plaintiffs' challenges under Iowa Code chapter 335. I agree that ordinance 24 must be disapproved, but respectfully dissent from the majority holding that ordinances 22, 23, and 25 conflict with statutory law. I

think they were authorized under the home rule amendment.

Whether statewide regulation is a good or bad idea is, as the majority recognizes, a political issue for resolution by the General Assembly. So long as it does so constitutionally[1] it is entirely up to the legislature to determine whether local government, state government, or both, or neither, should superintend the regulation of hog lots. Our question is not what the legislature should do, but rather to determine what it has done.

All applicable statutes stand in plain view of the home rule rights granted to counties by article III, section 39A of the Iowa Constitution. The majority is on solid ground in stating that the grant of home rule is not unlimited. But the fact that local governments must yield to state law should not obscure the vast change wrought by the home rule amendment which was intended to revolutionize the relationship between state and local governments. Claims such as the present one should be tested in the light of the home rule philosophy that found its way into our constitution: where practicable, local problems should be addressed by local government. To pursue that goal we should strive to uphold, rather than to thwart, efforts of counties to govern local affairs. In interpreting the twin (city) home rule amendment, we described our approach this way:

> A city has the power to enact an ordinance on a matter which is also the subject of statute if the ordinance and statute can be harmonized and reconciled. A municipal ordinance is "inconsistent" with a law of the General Assembly and, therefore, preempted by it, when the ordinance prohibits an act permitted by a statute, or permits an act prohibited by a statute. In considering a claim that a city ordinance violates "home rule" powers, *we interpret the state law in such a manner as to render it harmonious with the ordinance.*

Iowa Code § 331.301(4).

general home rule powers indicates an intent not to do that.

**2.** The statute provides:
An exercise of a county power is not inconsistent with a state law unless it is irreconcilable with that state law.

**1.** No constitutional challenge is implicated in the present appeal.

If the statute and ordinance cannot be reconciled, the statute prevails.

*Sioux City Police Officers' Ass'n v. Sioux City,* 495 N.W.2d 687, 694 (Iowa 1993) (citations omitted) (emphasis added). The same approach governs challenges under county home rule. *Polk County Bd. of Supers. v. Polk Commw. Charter Comm'n,* 522 N.W.2d 783, 791 (Iowa 1994). The implications of this important case extend far beyond the immediate issue of the regulation of livestock confinement facilities. I have a sinking feeling that the concept of home rule for local governments, guaranteed in our constitution, will suffer under the majority holding.

I. With regard to ground water control, I agree that ordinance 24 cannot withstand plaintiffs' challenge, although I would rest the holding on a finding of express preemption. Iowa Code section 455B.172(5) reserves to the state—through the department of natural resources—exclusive jurisdiction to set standards regarding ground water as it relates to disposal of waste from livestock confinement structures. I agree with the majority that the general authorization to local governments granted under Iowa Code section 455E.10(2) must yield to the specific authorization in section 455B.172(5). This provision is also important for what it reveals beyond the preemption it provides. It also demonstrates that the legislature knows well how to express itself when it intends to claim exclusive statewide jurisdiction over a subject matter.

II. I disagree with the majority's holding that ordinances 22, 23, and 25 conflict with state law and would affirm the trial court's ruling upholding them. Iowa Code section 331.301(1) is a general grant of authority for counties to exercise powers and protect and preserve the property of its residents. This is a statutory grant in addition to the constitutional home rule provision previously mentioned. Local ordinances of course must be reconcilable and not inconsistent with the legislative intent and scheme of state law. Local ordinances however may "set standards and requirements which are higher and more stringent than those imposed by state law." Iowa Code § 331.301(6). The majority goes to great length in an attempt

to accommodate the grant of local governmental power to set more stringent standards with the requirement of consistency. In the end the majority concludes the ordinances are inconsistent, rather than merely imposing a higher standard. I disagree. The ordinances at issue set forth standards for various livestock confinement operations. Many of these standards and requirements are more stringent than those imposed by state law. But this factor does not render them invalid. *See Sioux City Police Officers' Ass'n,* 495 N.W.2d at 695; *Bryan v. City of Des Moines,* 261 N.W.2d 685, 687 (Iowa 1978).

There is another strong indication the legislature did not intend to bar the ordinances challenged here. Iowa Code section 455B.144 provides for local control of air pollution:

1. Any political subdivision may conduct an air pollution control program within the boundaries of its jurisdiction. . . . In conducting such programs, political subdivisions may adopt and enforce rules or standards to secure and maintain adequate air quality within the respective jurisdictions.

2. If the board of supervisors in any county establishes an air pollution control program and has obtained a certificate of acceptance, the agency implementing the program may regulate air pollution within the county including any incorporated areas therein until such incorporated areas obtain a certificate of acceptance as a joint or separate agency.

What the majority has done, after rejecting the preemption challenge, is to then embrace a rewired version of it in the guise of inconsistency. Surely where, as here, the claim of preemption is correctly rejected, a constitutional right granted to local government should not fail on so frail a ground that the local provision is unfriendly to a state plan. It should require a sterner confrontation than this. At least one state has gone so far in interpreting a similar home rule provision as to require a showing that the two provisions "cannot coexist." *E.B. Elliott Adv. Co. v. Metropolitan Dade County,* 425 F.2d 1141, 1150 (5th Cir.1970). We need not

accept so strong an interpretation in order to affirm here, of course, because there is ample room for accommodation between the Iowa Code and the challenged ordinances.

Except as to ordinance 24, I think the trial court was correct in rejecting the challenges, and as to ordinances 22, 23, and 25, I would affirm.

SNELL, Justice (dissenting).

The majority opinion displays fine scholarship and a careful approach to the issues in this case. I agree with much of its content but do not agree with the ultimate result reached.

I would affirm the trial court's finding that the Humboldt County ordinances are not an exercise of the county's zoning power. They do not, therefore, conflict with the state law establishing a zoning exemption for agricultural land and structures under Iowa Code chapter 335.

I agree with the majority's analysis of express preemption and find that the state has not exercised this right in the provisions of House File 519. I also join the majority in finding that there is no statement in this legislation indicating that uniformity or statewide regulation was intended to apply to animal feeding operations. I do not agree, however, that the Humboldt County ordinances are, nevertheless, invalid as in conflict with state law.

In its analysis of Iowa's "home rule" laws as supportive of the result reached, the majority has veered away from the course set by our court for many years. Although acknowledging their existence, the majority has not responded to the thrust of our decisions that promote and solidify the concept of home rule. Those decisions gave structure to the home rule constitutional amendment that announced a 180 degree turn from our previous law.

The Iowa Constitution's county home rule amendment of 1978 states in part:

Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and govern-ment, except that they shall not have power to levy any tax unless expressly authorized by the general assembly.

. . . .

The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state.

Iowa Const. art. III, § 39A.

This constitutional principle is also found in our statutory law. Iowa Code section 331.301 (1995) states:

1. A county may, except as expressly limited by the Constitution, and if not inconsistent with the laws of the general assembly, exercise any power and perform any function it deems appropriate to protect and preserve the rights, privileges, and property of the county or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents.

. . . .

3. . . . A county may exercise its general powers subject only to limitations *expressly* imposed by a state law.

4. An exercise of a county power is not *inconsistent* with a state law unless it is *irreconcilable* with the state law.

(Emphasis added.) These subparagraphs clearly show the legislative intent that home rule powers be stiffened and protected from state overriding, which is to be permitted only as a last resort.

Subparagraph six recognizes that as a part of the home rule powers granted by our constitution, a county may not set lower standards of law than those imposed by the state but may set higher standards. It states:

A county shall not set standards and requirements which are lower or less stringent than those imposed by state law, but may set standards and requirements which are higher or more stringent than those imposed by state law, unless a state law provides otherwise.

*Id.* § 331.301(6).

The antithetical phrasing in this statute shows that the legislature's concern was that state standards not be undercut by a coun-

ty's adoption of weaker standards. Higher standards and requirements by counties were apparently not of concern.

Cities are the recipients of like treatment under the Iowa Constitution's municipal home rule provision and state law. *See* Iowa Const. art. III, § 38A; Iowa Code ch. 364. In 1978, immediately after the ratification of the county home rule amendment, we said, "Home rule empowers a city to set standards 'more stringent than those imposed by state law, unless a state law provides otherwise.'" *Bryan v. City of Des Moines*, 261 N.W.2d 685, 687 (Iowa 1978) (quoting Iowa Code § 364.3(3)).

In *Bryan*, we noted that express limitations by statute on a city's authority to establish employment qualifications were not involved. No mention of implied limitations, if any such principle exists, was made. Further, we said:

> We hold the civil service commission's sole prerogative to give promotional examinations does not constitute exclusive authority to establish promotional qualifications.

*Id.* Thus, we concluded the city's education requirement was simply an additional qualification that the city could validly impose because it was not inconsistent with state law.

In *City of Council Bluffs v. Cain*, 342 N.W.2d 810 (Iowa 1983), we breathed more life and meaning into what constitutes "inconsistency" with state statutes. This case is remarkably similar to the case at bar. In 1982, the defendant owned a forty-acre farm, owned by his family for seventy-five years, and located within the city limits of Council Bluffs. *Cain*, 342 N.W.2d at 811. That year, the city passed an ordinance that imposed a number of regulations on the keeping of farm animals. Section 4.20.280 required anyone who kept farm animals inside the city limits to obtain a permit and pay a $25 licensing fee. The permit could be obtained only after an inspection for compliance with the sanitation regulations set out in other sections of the ordinance. Those regulations dealt with manure removal, fences, animal populations, feeding conditions, feed storage, and minimum distances from residences. *Id.* at 812.

In analyzing whether state law prohibited these ordinances, we said:

> We first consider defendant's contention that farm animal control cannot be the subject of a municipal ordinance. Defendant thinks the city lacks the power to regulate farm animals because the subject has been preempted by state law. It is a well established principle that municipal governments may not undertake to legislate those matters which the legislative branch of state government has preserved to itself. There are alternative ways for a state legislature to show such a preservation. One is of course by specific expression in a statute. Another is, as defendant suggests, by covering a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law. *See City of Vinton v. Engledow*, 258 Iowa 861, 867, 140 N.W.2d 857, 861 (1966); 56 Am.Jur.2d *Municipal Corporations* § 375 (1971).
>
> Cities are not necessarily precluded from enacting ordinances on matters which have been the subject of state statute. The traditional test has been whether an ordinance prohibits an act permitted by a statute, or permits an act prohibited by a statute. *See Towns v. City of Sioux City*, 214 Iowa 76, 84, 241 N.W. 658, 662 (1932). In the past, even if an ordinance passed this test it could be invalidated if the municipality was not expressly empowered by the state to enact it. *See Dotson v. City of Ames*, 251 Iowa 467, 470–72, 101 N.W.2d 711, 713–14 (1960); *Merriam v. Moody's Executors*, 25 Iowa 163, 170 (1868).

*Id.* at 812.

Regarding home rule and the meaning of "inconsistency" we said:

> Iowa has since adopted the home rule constitutional amendment. *See* Iowa Const. art. III, § 38A. *See also* Iowa Code § 364.2(2) and (3) (1983). Under home rule, a city has the power to enact an ordinance on a matter which is also the subject of statute if the ordinance and statute can be harmonized and reconciled. *City of Iowa City v. Westinghouse Learning Corp.*, 264 N.W.2d 771, 773 (Iowa 1978); *Chelsea Theater Corp. v. Burling-*

*ton,* 258 N.W.2d 372, 373 (Iowa 1977); *Airport Commission for City of Cedar Rapids v. Schade,* 257 N.W.2d 500, 505 (Iowa 1977); *Green v. City of Cascade,* 231 N.W.2d 882, 890 (Iowa 1975).

We think the ordinance challenged here easily can be harmonized with state law. To be sure there are extensive state regulations and licensing provisions for farmers who keep or breed livestock. *See* Iowa Code ch. 162 (registration of animals); chs. 163–166C (prevention of disease among animals); section 163.26, *et seq.* (feeding garbage to animals); section 163.40, *et seq.* (breeding bulls); ch. 167 (use and disposal of dead animals); ch. 188 (estrays and trespassing animals). *See also* Iowa Admin. Code ch. 11 (regulation of poultry and egg production); ch. 12 (dead animal disposal); ch. 16 (prevention of livestock diseases); chs. 30–31 (regulation of dairy production).

Nevertheless we find no statute or regulation expressly permitting what the challenged ordinance prohibits or expressly prohibiting the city from requiring a permit and fee for keeping farm animals within city limits. The city plainly holds the power to adopt a farm animal control ordinance. Defendant's contention to the contrary is without merit.

*Id.* at 812–13.

This case held the ordinances were not preempted by state law and were not inconsistent with state law, where the keeping of farm animals was locally regulated. The case is not authority for recognizing a doctrine of implied preemption in home rule cases. In fact, the phrase "implied preemption" is never used in the opinion. The opinion merely recognizes, by dictum, that preservation of an area of law by the legislature may be expressed in a single statute or by covering a subject by statutes, an alternate means of express preemption.

*City of Vinton v. Engledow,* 258 Iowa 861, 140 N.W.2d 857 (1966), relied on by the majority as an example of expression of legislative intent, is an express preemption case. It is a criminal case deciding whether a city could enact a reckless driving ordinance when the state statute had defined "reckless

driving." *Engledow,* 258 Iowa at 864–65, 140 N.W.2d at 860. The case held the city could not enact such an ordinance because the state statute came within the purview of a statute providing that the provisions of the chapter shall be applicable and uniform throughout the state. *Id.* at 865, 140 N.W.2d at 860. The case was decided in 1966 as an interpretation of state statutes in effect before adoption of the municipal home rule constitutional amendment in 1968. As such, it lacked the driving force of the constitutional imprimatur of home rule. And, even taken at face value, the *Engledow* case was able to marshal only a five to four majority. It has no precedential value in deciding the case at bar.

Cases cited by the majority as illustrating city ordinances inconsistent with state law do not support the result reached by the majority. In *Cedar Rapids Human Rights Commission v. Cedar Rapids Community School District,* 222 N.W.2d 391 (Iowa 1974), the city established a human rights commission to decide grievances involving human rights violations. The state law specifically stated that its statutes were not intended to occupy the field. *Cedar Rapids,* 222 N.W.2d at 398. The case held that the ordinance was invalid as inconsistent with the state human rights statute, however, because it did not provide for judicial review as provided under the state statute. *Id.* at 402. Thus, the ordinance was inconsistent and invalid because it authorized a lower standard than did the state. Moreover, the *Cedar Rapids Human Rights Commission* case is a due process case, a question not involved in the case at bar. Other than illustrating "lower standards," the case has little relevance to the case at bar.

The second Iowa case cited by the majority in support of its distinction concerning "inconsistency" is *City of Iowa City v. Westinghouse Learning Corp.,* 264 N.W.2d 771 (Iowa 1978), another due process case. It cites and follows *Cedar Rapids* in that the city of Iowa City established a local civil rights commission but failed to provide any hearing before the commission from which a review might be taken to the district court. *City of Iowa City,* 264 N.W.2d at 773. The

ordinance transferred to the courts the task of originally deciding whether a discriminatory practice existed, rather than having the courts review an administrative decision, as provided by the state civil rights statute. The ordinance completely reversed the legal procedure provided by state statutes and was therefore inconsistent and invalid. *Id.* This case is another due process case invalidating an ordinance that established lower standards than the state statutes provided. The ordinance conflicted with Iowa Code section 331.301(6) and was therefore invalid. Beyond this illustration, it has no relevance to the instant issues.

Similarly, in *Decatur County v. PERB*, 564 N.W.2d 394 (Iowa 1997), we held an ordinance inconsistent with a state statute. Here, the ordinance tried to make a collective bargaining issue not a mandatory bargaining subject when state statutes clearly stated it was. *Decatur County*, 564 N.W.2d at 396. The home rule amendment did not validate the ordinance because it was clearly inconsistent and not amenable to harmonizing. *Id.* at 397–98. Lower or higher standards relating to "inconsistency" were not involved.

By contrast, we have consistently upheld the constitutional grant of home rule in other cases decided since 1978. In *City of Des Moines v. Gruen*, 457 N.W.2d 340 (Iowa 1990), we held a city ordinance regulating the parking and storage of lawfully unregistered vehicles was not inconsistent with state law. In language resonating with an issue structure strikingly like the case at bar, we said:

> In considering Gruen's claim we are obliged to interpret the state law in such a manner as to render it harmonious with the ordinance. *See* Iowa Code § 364.2(8); *Green v. City of Cascade*, 231 N.W.2d 882, 890 (Iowa 1975). If the statute and the ordinance cannot be reconciled, the statute prevails. *See* Iowa Code § 364.2(3); *Green*, 231 N.W.2d at 890. A municipality may enact ordinances on matters which are also the subject of state statutes. *Cain*, 342 N.W.2d at 812. Indeed, a municipality is free to set standards "more stringent than those imposed by state law, unless a state law provides otherwise."

Iowa Code § 364.3(3); *Bryan v. City of Des Moines*, 261 N.W.2d 685, 687 (Iowa 1978). Limitations on a municipality's power over local affairs are not implied; they must be imposed by the legislature. *Bryan*, 261 N.W.2d at 687.

Gruen's argument boils down to one proposition: because the general assembly has provided that he may lawfully possess unregistered vehicles under certain conditions, the city may not in any manner regulate where or how he parks those vehicles. We do not accept this proposition.

> Under the *Cain* analysis, it is clear that the ordinance does not prohibit an act permitted by Iowa Code section 321.48(1). *See Cain*, 342 N.W.2d at 812. It is lawful to possess unregistered vehicles in Des Moines under both the ordinance and the statute. It is equally clear that the ordinance does not permit an act prohibited by the statute, or invade an area of law reserved by the legislature to itself. *See id.* Iowa Code section 321.48(1) does not prohibit the city from regulating the parking and storage of lawfully unregistered vehicles, nor does Gruen point us to any other state law which preempts Des Moines City Code section 2A–7(S).
>
> The statute and the ordinance may be harmonized: Gruen may lawfully possess unregistered vehicles in Des Moines, but he may not store them in a residential neighborhood unless in an enclosed building. Even then, of course, he may not conduct his used car business at his residence if to do so would violate a valid zoning law. *See generally* Iowa Code ch. 414 (Municipal Zoning).

*Gruen*, 457 N.W.2d at 342–43.

In *Sioux City Police Officers' Ass'n v. City of Sioux City*, 495 N.W.2d 687 (Iowa 1993), we reviewed the home rule constitutional and statutory law and concluded that the city's anti-nepotism resolution that adopted additional qualifications for employment, promotion and discharge of employees was not inconsistent with state statutes. We said:

> The associations argue that the City's anti-nepotism policy creates qualifications

for employment, promotion, transfer, and discharge which are not authorized by the specified sections in Iowa Code chapter 400 regarding civil service employment. While chapter 400 includes some criteria which *must* be considered and some criteria which *must not* be considered in employment action, the Iowa legislature did not intend the chapter to provide the exclusive basis for employment decisions. A civil service employer may impose additional qualifications and criteria. *See Hollinrake,* 452 N.W.2d at 601 (court recognized authority to determine minimum fitness for deputy sheriff position through the establishment of vision standards); *Borlin v. Civil Service Comm'n,* 338 N.W.2d 146, 149 (Iowa 1983) (court recognized authority of municipality to establish restrictions on secondary employment); *Bryan,* 261 N.W.2d at 685 (court recognized authority to establish minimum educational requirement was within the city's power to establish qualifications for promotion in the police department).

Iowa Code section 400.9 gives the civil service commission the power to conduct promotional examinations for the purpose of "determining the qualifications of applicants for promotion to a higher grade under civil service." This section does not expressly preclude the City from adopting *additional* criteria for qualification and promotion. In *Bryan,* we stated "[p]assing a promotional examination is essential to a promotion but is not made the exclusive measure of qualifications.... We hold the civil service commission's sole prerogative to give promotional examinations does not constitute exclusive authority to establish promotional qualifications." We held that the City of Des Moines could require its police officers to have some college education to be eligible for a promotion. We believe that *Bryan* controls in this case; the civil service commission's power to conduct promotional exams does not expressly prohibit the City of Sioux City from adopting additional criteria for promotion.

. . . .

Section 400.17 provides additional *minimum* qualifications for civil service employment and again does not expressly limit the public employer's ability to establish additional criteria not prohibited elsewhere.

*Sioux City Police Officers' Ass'n,* 495 N.W.2d at 694–95.

*Sioux City Police Officers' Ass'n* highlights the adoption of higher standards and regulations that we held valid under the city's home rule authority and not "inconsistent" with state statutes.

The law and spirit of home rule was emphasized in *Polk County Board of Supervisors v. Polk Commonwealth Charter Commission,* 522 N.W.2d 783 (Iowa 1994). We held that the county home rule amendment, Iowa Const. art. III, § 39A, controlled the extent of the charter commission's powers since the commission was a creature of the legislature. *Polk County,* 522 N.W.2d at 792. Thus, the old Dillon rule that allowed only those powers expressly granted by the legislature did not apply. Following the constitutional directive, we construed the commission's powers liberally, as a local institution, in order to promote the objectives of the constitutional amendment and the legislature. *Id.*

We considered the home rule amendment again in *City of Clinton v. Sheridan,* 530 N.W.2d 690 (Iowa 1995). The question was whether a home rule charter adopted by Clinton in 1987 was contrary to Iowa law. We cited the municipal home rule amendment of 1968 and held there was nothing inconsistent with state statutes and the Clinton home rule charter. Regarding home rule we said:

We expanded our historical review of home rule following the adoption of the constitutional amendment and the City Code of Iowa. We concluded the intention of the framers of the constitutional amendment was to grant cities power to rule their local affairs and government subject to the superior authority of the general assembly.

*Sheridan,* 530 N.W.2d at 692–93 (citations omitted).

Applying the constitutional amendment, we said:

The constitutional amendment granted home rule power to determine local affairs and *government*. The City of Clinton is organized under a home rule charter form of government permitted by the amendment and specifically allowed under the City Code of Iowa. The City of Clinton's charter expressly authorizes initiative and referendum adoption and repeal of ordinances. The home rule amendment granted the city power to determine its local government. The city is no longer dependent upon the legislature to grant it power. "Any limitation on a city's power by state law must be expressly imposed." *Bryan v. City of Des Moines*, 261 N.W.2d 685, 687 (Iowa 1978). We find no irreconcilable conflict between the provisions of the City Code of Iowa and the initiative and referendum provisions of the Clinton home rule charter.

*Id.* at 694.

Rejecting the argument that the charter provisions were inconsistent with state election laws and again rejecting the Dillon rule, we said:

Here, the attorney general suggests, in the absence of express statutory authority, the submission of an initiative or referendum would be invalid. This suggestion is a carry-over of the *Dillon* rule under which a municipal corporation possessed and exercised only those powers granted by the legislature in express words.

To require specific statutory authority to permit an initiative or referendum vote is contrary to the intent of the amendment that rejected the *Dillon* rule. Cities no longer have only those powers granted by the legislature. *Bryan*, 261 N.W.2d at 687. We find no irreconcilable conflict between the election laws and the initiative and referendum provisions of the Clinton home rule charter. If the general assembly intended to preempt municipal initiative and referendum powers, it could have done so by express and unambiguous statutory language. *See Chelsea Theater Corp. v. City of Burlington*, 258 N.W.2d 372, 373 (Iowa 1977). We find no preemption problem.

*Id.* at 695.

As these cases show, we have thoroughly studied these issues before, though in differ-

ent clothing. In fact, we have established the law, mandating the holding that the Humboldt County ordinances are valid under home rule law. The case of *City of Council Bluffs v. Cain* did so in validating the city ordinances regulating the keeping of farm animals in the city. The case is not different in legal principle, and controls the issue of regulating farm animal production in the county. Size of hog operations and greater numbers do not change the law in this matter. In accord are the cases of *Bryan*, *Gruen*, and *Sioux City Police Officers' Ass'n*.

The clear import of these cases applying home rule constitutional and statutory law is that only a high degree of inconsistency will invalidate a local ordinance. Moreover, before a subject area may be deemed to be preempted, the legislature must expressly declare it to be preempted by unambiguous statutory language. I believe that the legislature in enacting House File 519 did not include unambiguous language of subject-wide preemption that invalidates the Humboldt County ordinances. All of these ordinances fit within the sphere of home rule as authorized by our constitution and statutes.

Words of preemption are conspicuously absent from the language of House File 519. To fill that void, regarding ordinance 24 regulating manure application and groundwater protection, plaintiffs claim that preemption language is found in Iowa Code section 455B.172(5). That language is the use of the word "exclusively" regarding the responsibility of the Department of Natural Resources for adopting standards and issuing licenses for commercial cleaning of livestock confinement structures and disposal of waste. However, Iowa Code section 455E.10(2) states:

Political subdivisions are authorized and encouraged to implement groundwater protection policies within their respective jurisdictions, provided that implementation is at least as stringent but consistent with the rules of the department.

These statutes are in conflict with each other in indicating what local regulations in the area of groundwater protection are sanc-

tioned. An ambiguity exists that is not resolved by resorting to Iowa Code section 4.7 which directs that a special statute prevails over a general statute. I do not reach the application of section 4.7 because the constitutional provisions of home rule prevail over other statutory rules. The home rule constitutional amendment authorizing local ordinances is paramount unless the local ordinance is "inconsistent with the laws of the general assembly." Here, ordinance 24 is not inconsistent because the laws of the general assembly are ambiguous. It cannot be said that ordinance 24 "prohibits an act permitted by statute, or permits an act prohibited by a statute" in the face of statutes that are in conflict and therefore ambiguous. Stated otherwise, exclusivity is not established unambiguously, and there is no express preemption by the legislature of this subject area.

The Humboldt County ordinances include higher and more stringent regulations but none of them prohibits large livestock confinement feeding operations in the county. If an operator complies with the regulations, large livestock confinement feeding operations are permitted.

In considering questions of home rule, we have consistently quoted and applied the statutory component of home rule that empowers counties as follows:

> A county shall not set standards and requirements that are lower or less stringent than those imposed by state law, but may set standards and requirements which are higher or more stringent than those imposed by state law, unless a state law provides otherwise.

Iowa Code § 331.301(6). This section establishes a floor rather than a ceiling for what standards and regulations a county is authorized to enact. It is the essence of home rule that counties are permitted to have "higher and more stringent" and thus stricter laws than those imposed by the state. Those local laws are ab initio and conceptually "inconsistent" because they are "higher and more stringent." But this difference is constitutionally and statutorily not only permitted but encouraged.

These laws are given only passing recognition and are in fact ignored by the majority in its analysis that embraces the idea that "any attempt by a local government to add to [state] requirements would conflict with state law." In deciding this case through this analysis, the majority has failed to follow the precedents set by our cases and has, as Justice Harris decries, returned to the Dillon rule that was rejected by the home rule constitutional amendment. Whether the Dillon rule has been excavated from the grave or preemption has re-emerged under the new name of inconsistency, or inconsistency has swallowed the law permitting higher and more stringent standards, the majority has drained the vitality from home rule. Little is left to local government that could withstand the avarice of an inconsistency meaning so pervasive.

Land contours, soil types, drainage efficiencies, population centers, rain levels, even air currents, vary from locale to locale. Characterizing a subject as having statewide importance does not lessen the impact of problems encountered locally. That is the message embraced by the citizens of Iowa in adopting the home rule amendment.

If the legislature believes the subject matter of the Humboldt County ordinances should be preempted by state statutes, the law provides the clear means. An express preemption statement of unambiguous language would determine the issue, if that is the will of the legislature. Contentious issues of policy should not be left to travel the circuitous, linguistic paths of the courts.

The district court properly followed the course we have charted in upholding and advancing the purpose of the home rule constitutional amendments and their supporting statutes. I would affirm the district court on all issues.