No. 53,616

MISSOURI PACIFIC RAILROAD, *Appellee,* v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF GREELEY, KANSAS, *Appellant.*

(643 P.2d 188)

Opinion filed April 3, 1982.

*K. Mike Kimball,* of Hathaway & Kimball, of Ulysses, argued the cause and was on the brief for the appellant.

*Phillip R. Fields,* of Gott, Young & Bogle, P.A., of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: The Missouri Pacific Railroad (Mo-Pac) filed a declaratory judgment action in the district court to determine the validity of a home rule resolution referred to as the "Greeley County Dirt Embankment Act," passed by Greeley County. The case was submitted to the court on documentary evidence which evidence included the pleadings, certain exhibits, affidavits and the deposition of Thomas Hall, assistant engineer for Mo-Pac. The district court found that several sections of the "Greeley

County Dirt Embankment Act" contravened the home rule powers of the county granted in K.S.A. 19-101 *et seq.* and declared the Act void. The county has appealed from that ruling.

The court found that the Act was not such a restraint on interstate commerce as to be in violation of the Commerce Clause of the United States Constitution. No appeal has been taken from that ruling and that matter is not now before this court.

It may be helpful to review some of the history of home rule in Kansas. Home rule powers are those granted by the Constitution or by legislative act to units of local government to transact local business and perform such local legislative and administrative duties as these local units may deem appropriate, subject to certain limitations imposed upon such grant of power. Home rule powers were granted to cities by constitutional amendment in 1961. Kans. Const. art. 12, § 5. In 1974, thirteen years later, the legislature passed an act granting powers of home rule to counties. L. 1974, ch. 110. Counties in Kansas are now empowered to transact all county business and perform such powers of local legislation and administration as may be appropriate, subject, however, to the restrictions and prohibitions set forth in K.S.A. 19-101a.

Although there have been numerous cases decided by the appellate courts of this state dealing with city home rule, we find no Kansas cases dealing with county home rule powers. However, the home rule powers granted to cities by constitutional amendment and to counties by legislative act appear to be similar and parallel each other in many particulars. The case law dealing with city home rule powers should be particularly helpful here.

K.S.A. 19-101a provides in part:

"(*a*) Counties are hereby empowered to transact all county business and perform such powers of local legislation and administration as they deem appropriate, subject only to the following limitations, restrictions, or prohibitions: *First,* counties shall be subject to all acts of the legislature which apply uniformly to all counties; . . .

"(*b*) Counties shall apply the powers of local legislation granted in subsection (*a*) of this section by resolution of the board of county commissioners. If no statutory authority exists for such local legislation other than that set forth in subsection (*a*) of this section and the local legislation proposed under the authority of such subsection is not contrary to any act of the legislature, such local legislation shall become effective upon passage of a resolution of the board and publication in the official county newspaper. If the legislation proposed by the board under authority of subsection (*a*) of this section is contrary to an act of the

legisiature which is applicable to the particular county but not uniformly applicable to all counties, such legislation shall become effective by passage of a charter resolution in the manner provided in K.S.A. 19-101b."

K.S.A. 19-101c provides:

"The powers granted counties pursuant to this act shall be referred to as county home rule powers and they shall be liberally construed for the purpose of giving to counties the largest measure of self-government."

Counties are prohibited, however, from passing any legislation which is contrary to or in conflict with any act of the state legislature which is of uniform application to all counties throughout the state. K.S.A. 19-101a(*a*) *First*, (*b*).

Defendants rely on *City of Garden City v. Miller,* 181 Kan. 360, 366, 311 P.2d 306 (1957), wherein this court stated:

"The fact that the state has enacted legislation on a subject does not necessarily deprive a city of the power to deal with the same subject by ordinance. [Citations omitted.] A municipality may legislate on the same subject so long as the municipal ordinance does not conflict with the state law [citations omitted], and if there is no conflict, both laws may stand."

The *Miller* case, although decided prior to home rule in Kansas, sets forth rules of law which remain applicable to local ordinances and resolutions adopted under home rule powers. See *City of Junction City v. Lee,* 216 Kan. 495, 532 P.2d 1292 (1975). However, the *Miller* case is readily distinguishable from the present case. In *Miller* a traffic ordinance was being considered. The local ordinance against driving while under the influence of intoxicating liquors was found not to be in conflict with the state statute on the subject. Further, the state statute provided that cities could adopt "*additional traffic regulations,* which are not in conflict with the provisions of the act." 181 Kan. at 365. Thus, there was no conflict or pre-emption of the field by state legislative action. The primary method of determining whether an ordinance or resolution of a county is inconsistent with a statute of the state is to see whether the local law prohibits what the state law permits or the state law prohibits what the local law permits.

The legislature may reserve exclusive jurisdiction to regulate in a particular area when an intent is clearly manifested by state law to pre-empt a particular field by uniform laws made applicable throughout the state. See discussion in *Garten Enterprises, Inc. v. City of Kansas City,* 219 Kan. 620, 623, 549 P.2d 864 (1976); *City of Junction City v. Lee,* 216 Kan. at 502-03; and *City of Lyons v. Suttle,* 209 Kan. 735, 738, 498 P.2d 9 (1972).

The rule denying power to a local body when the state has pre-empted the field is a rule of necessity based upon the need to prevent dual regulation which would result in uncertainty and confusion; and whether the state has pre-empted the field to the exclusion of local legislation depends not only on the language of the statutes, but upon the purpose and scope of the legislative scheme. *Abbott v. City of Los Angeles*, 53 Cal. 2d 674, 3 Cal. Rptr. 158, 349 P.2d 974 (1960); *Kim v. Town of Orangetown*, 66 Misc. 2d 364, 321 N.Y.S.2d 724 (1971); and *City of Baytown v. Angel*, 469 S.W.2d 923 (Tex. Civ. App. 1971).

Now we turn to the facts of our present case. Mo-Pac began acquiring a strip of land along the north side of its present right-of-way in Greeley County by both private contract and by eminent domain, said land to be used in the construction of a "dust levee" to control dust buildup and snow drifts in its trackbed along a seven-mile stretch of its right-of-way in the extreme western part of Greeley County which borders Colorado. Similar "dust levees" have been previously constructed along the tracks in eastern Colorado. The land being acquired by the railroad consists of a strip 100 feet wide adjacent to the north right-of-way line. The "dust levee" to be constructed will be 11 feet high and 36 feet wide at the base. The crown will be two or three feet wide and the slope will be 1 ½ to 1. Borrow pits on either side of the levee will be 12 feet wide extending out from the base of the levee and not more than five feet deep.

After the railroad began acquiring land by private contract, and about the time eminent domain proceedings were first under-taken, the county commissioners adopted the "Greeley County Dirt Embankment Act" which is as follows:

"RESOLUTION

"WHEREAS, it has come to the attention of the County Commissioners that various people and corporations are proposing to build dirt embankments over six feet in height in Greeley County and that said Dirt Embankments may endanger and adversely effect neighboring land owners and the welfare of citizens of Greeley County by causing unnatural diversion of winds, unnatural accumulation of weeds and snow, breeding grounds for insects and weeds, and health and death hazards for livestock which may stray in times of storms.

"IT IS THEREFORE RESOLVED:

"SECTION I

"A. No Dirt Embankments over six feet in height shall be constructed in the county of Greeley without first obtaining from the County Commissioners a permit to build said Dirt Embankment.

"B. A separate building permit shall be required for each 2,640 lineal feet of proposed Dirt Embankment.

"C. Any person or corporation building a Dirt Embankment after the passing of this resolution without first obtaining a building permit, as required by this resolution, shall be guilty of a misdemeanor and subject to a fine of $500.00. Each day a Dirt Embankment or a portion thereof, requiring a permit, exists without first having obtained a proper building permit shall be deemed a separate offense.

## "SECTION II

"A. All application for Dirt Embankments shall furnish the following information:

"1. The exact location of the proposed Dirt Embankment, setting forth specifically, the number of feet between the edge of the Dirt Embankment and adjacent owner's property lines.

"2. A description of the height and width of the proposed Dirt Embankment and the proposed material from which it is being constructed.

"3. A description of the safeguards taken to protect the health of livestock straying during storms.

"4. A description of the safeguards taken to protect adjacent property owners from damage caused by the unnatural accumulation of weeds and snow.

"5. A description of the safeguards taken to protect adjacent land owners from crop damage caused by any accumulation of insects and weeds which may be caused by the construction of the Dirt Embankment.

"6. Proof that land adjacent to proposed Dirt Embankment has been a detriment to the security of the people and corporations.

"B. Any person or corporation making an application for the construction of a Dirt Embankment shall pay application fee in the amount of $5.00 for each application.

## "SECTION III

"A. No building permit shall be issued for the construction of Dirt Embankments unless it is shown that adequate safeguards have been taken by the person or corporation proposing to construct said Dirt Embankments to protect the health and lives of straying cattle in times of storms and to protect adjacent land owners from the effects of unnatural diversion of surface winds including the unnatural accumulation of snow and weeds.

"B. No permit for building a Dirt Embankment shall be issued by the County of Greeley unless the application shows that there are adequate safeguards to protect adjacent land owners from an unnatural accumulation of weeds and insects caused by the construction of a Dirt Embankment.

## "SECTION IV

"A. All Dirt Embankments constructed of dirt shall be planted within twelve month safter construction to native grass and the same shall be maintained throughout the life of the Dirt Embankment.

"B. In the event that a Dirt Embankment is constructed from dirt obtained from an adjacent pit or a pit within 100 yards of the Dirt Embankment or any extension thereof, then and in that event, said pit shall be no deeper than four (4) feet in depth and shall be surrounded by a fence of at least eight (8) feet in height containing a post at least every rod and at least four (4) strands of barbed wire no

closer than one (1) foot apart, the first being no more than two (2) foot from the ground. Said fence shall contain an unlocked gate.

"SECTION V

"A. This resolution shall be cited as a Greeley County Dirt Embankment Act.

"B. If any provision of this resolution or the application thereof, to any person or circumstances is held invalid, the invalidity does not effect other provisions or applications of this ordinance which can be given without the invalid provision or application, and to this end the provisions of the resolution are severable.

"C. This resolution shall go into effect on the 1st day of March, 1980.

"THE BOARD OF COUNTY COMMISSIONERS
OF GREELEY COUNTY, KANSAS"

Among the findings of the trial court appears the following:

"It should be noted that the evidence before the Court reflects that one of the purposes for the adoption of the Resolution was to delay Missouri Pacific Railroad in its construction of the 'dust levees'."

The appellant-board quarrels with this finding. The board argues the resolution was not limited to the construction of levees by the railroad, but applies to all persons and corporations desiring to build dust levees, dams, and embankments on any property in Greeley County. However, there was adequate evidence to support the trial court's finding. The action of the railroad toward construction of dust levees did precipitate the action of the county commissioners in adopting the resolution. The fact that others may be affected by the resolution does not change the apparent conclusion that the resolution was adopted in an effort to impose limitations on the railroad in constructing the levees along seven miles of its tracks in Greeley County.

The "Greeley County Dirt Embankment Act" became effective March 1, 1980. The district court in the eminent domain proceeding found the taking of private property for the purpose of constructing the dust levee was necessary for the lawful corporate purposes of the railroad. Further action has since been stayed pending a decision in this case.

As previously pointed out the exercise of home rule powers by a county must be directed to local legislation and administration. K.S.A. 19-101a(a). The power exercised cannot result in legislation which conflicts with an act of the legislature, and it cannot be exercised in any area which has been pre-empted by the state. Few, if any, ordinances and resolutions deal with an exclusively local matter and no statute regulates a matter which can be exclusively of statewide concern. The interests of the municipal-

ity or the county in such cases are nearly always concurrent with an interest of the state. Even if a local act has extraterritorial effect which makes its impact other than "purely local," the local act should stand if not in conflict with a state statute and not in an area clearly pre-empted by the state. Clark, *State Control of Local Government in Kansas: Special Legislation and Home Rule,* 20 Kan. L. Rev. 631, 677 (1972).

The railroads in Kansas, as public utilities, have been placed under the general supervision and are subject to control by the Kansas Corporation Commission, an agency of the state. K.S.A. 66-156. In addition to this supervision and control, we find chapter 66 of Kansas Statutes Annotated devoted in large part to state statutes regulating the railroads. Article 2 of chapter 66 concerns the various duties and liabilities imposed on railroads, including furnishing, loading, repairing, and unloading cars; construction and maintenance of crossings; and imposition of civil liability for failure to comply with such duties, as well as payment of damages for fire along the tracks. Liability is imposed against the railroads for damages to persons and property caused by negligence. Regulations are statutorily imposed requiring the railroads to construct and maintain their property, including the tracks, switches, and guardrails. Liability is imposed for killing or wounding livestock and the railroads are required to fence the tracks with a lawful fence or become liable without regard to negligence. The list of statutes regulating railroads include K.S.A. 66-201 to 66-2,122; 66-301 to 66-319; 66-501 to 66-524; and 66-701 to 66-706. These state statutory requirements governing railroads are comprehensive and include inspection and regulation at the hands of the Kansas Corporation Commission. K.S.A. 66-165 even provides that certain complaints against the railroads may be filed with and heard by the commission.

An examination of these statutes discloses several conflicts with the "Greeley County Dirt Embankment Act." K.S.A. 66-501 provides in pertinent part:

"Every railway corporation shall, in addition to the powers hereinbefore conferred, have power —

. . . . .

"*Third.* To lay out its road, not exceeding one hundred feet in width, and to construct the same; *and for the purpose of cuttings and embankments, to take as much more land as may be necessary* for the proper construction and security of the road; . . . and may take property under the power of eminent domain in the manner set forth in K.S.A. 26-501 to 26-516, inclusive." Emphasis supplied.

K.S.A. 66-502 provides:

"The directors of any railway corporation *may,* by a vote of two thirds of their whole number, at any time *change the* roadbed, or *road line, or any part thereof,* for the purpose of shortening the line, or *to overcome natural obstacles;* but such corporation shall not change the general route or terminus of the road." Emphasis supplied.

The Greeley County home rule resolution, as a condition precedent to utilization of the additional land acquired by Mo-Pac, requires the railroad to obtain a permit to build each dirt embankment. Before a permit can be issued, an application must be filed with the county commission detailing the location, description of, and the safeguards the railroad will undertake to protect livestock and crops of adjacent landowners. In addition Section II A 6 of the Act requires:

"6. Proof that land adjacent to proposed Dirt Embankment has been a detriment to the security of the people and corporations."

This requirement is vague and unclear if not totally unintelligible.

The trial court found that "[t]his language and the vagueness contained in other parts of the resolution could clothe the Commissioners with arbitrary power to be exercised merely at their will and caprice, whether they are disposed so to exercise it or not."

The local Act conflicts with the grant of authority in the state statutes which authorizes the railroad to acquire additional land for the purpose of "cuttings and embankments" and "change the roadbed, or road line, or any part thereof, for the purpose of shortening the line, or to overcome natural obstacles."

K.S.A. 66-295 *et seq.* imposes strict liability upon the railroad for killing or wounding livestock regardless of negligence, unless K.S.A. 66-299 is complied with. K.S.A. 66-299 requires the railroad to enclose the road with a good lawful fence. K.S.A. 66-308 relates to the construction of fences along the railroad and requires either a hog tight fence or a *lawful fence* corresponding in class to that maintained by the adjacent owner. In the case of a barbed wire fence, a railroad is required to construct a lawful fence which is described in K.S.A. 29-105, as follows:

"A barbed-wire fence, of not less than three wires, with the third wire from the

ground not less than forty-four inches nor more than forty-eight inches from the ground, and bottom wire not more than twenty-four inches nor less than eighteen inches from the ground, with the center wire equidistant, or nearly so, between upper and lower wires; said wires to be well stretched and barbed, barbs to average not more than nine inches apart; said barbed wire to be composed of two wires not smaller than No. 13, or one wire not smaller than No. 9, wires to be securely fastened to posts, which shall not be more than two rods apart and not less than twenty inches in the ground, and set in a workmanlike manner."

In direct conflict with the state fencing requirements, the "Greeley County Dirt Embankment Act" requires any borrow pit constructed by the railroad to be "surrounded by a fence of at least eight (8) feet in height . . . and at least four (4) strands of barbed wire no closer than one (1) foot apart, the first being no more than two (2) foot from the ground."

The requirement of a fence eight feet in height is somewhat incongruous when coupled with a requirement for construction of a four-wire barbed wire fence. This provision in the county resolution conflicts with state laws pertaining to the fencing of railroad right-of-ways. Time will not permit us to specifically point to all of the state laws governing the construction, operation and maintenance of railroads with which the "Greeley County Dirt Embankment Act" conflicts.

The regulation of railroads in this state is a matter of statewide concern and should not be left to local county government. The State of Kansas by legislative acts has reserved exclusive juris-diction to regulate in the areas covered by the "Greeley County Dirt Embankment Act" as applied to railroads, and said county resolution is invalid and beyond the home rule power of the county by reason of state pre-emption of the particular field covered by the county resolution, regulation of railroads. The need for statewide uniformity in regulation of the construction and maintenance of railroads which transverse this state is im-perative when one considers the public interest to be served by these public utilities. It becomes even more imperative when you consider the possibility of confusion and capricious action if additional regulation by each county in the state is permitted. The foregoing considerations lead to the conclusion that this county home rule resolution is unconstitutional because the state has pre-empted this area of legislation; that is, the state has evidenced a purpose and design to occupy the field so as to prohibit additional regulation by local authorities in the same area.

The Greeley County home rule resolution is invalid for the reasons stated and the judgment is affirmed.