**WORTH COUNTY FRIENDS OF AGRICULTURE, Ronald Balek, Lynn Butler, Vernon Gordon, Ted Lawyer, Dean Lindflott, Douglas Tempus, and Worth County Farm Bureau, Appellees,**

v.

**WORTH COUNTY, Iowa, Beverly Pangburn, Dorothy Hanna, and Darrell Bang, as Members of the Worth County Board of Supervisors, Appellants.**

No. 03–0552.

Supreme Court of Iowa.

Oct. 6, 2004.

Charles E. Cutler of Cutler Law Firm, P.C., West Des Moines, for appellants.

Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellees-Worth County Friends of Agriculture and individual appellees.

Christina L. Gruenhagen of Iowa Farm Bureau Federation, West Des Moines, and Paul Swinton and James Pugh of Morain, Burlingame & Pugh, P.L.C., West Des Moines, for appellee-Worth County Farm Bureau.

Wallace L. Taylor, Cedar Rapids, and Barclay Rogers of Sierra Club, San Francisco, California, for amici curiae Sierra Club, Iowa Farmers Union, and Worth County Concerned Citizens.

J. Campbell Helton of Whitfield & Eddy, P.L.C., Des Moines, for amici curiae Iowa Farm Bureau Federation, Iowa Cattlemen's Association, Iowa Pork Producers Association, Iowa Poultry Association, Iowa Dairy Products Association, Iowa Soybean Association, Iowa Institute for Cooperatives, Agribusiness Association of Iowa, Iowa Turkey Federation, Iowa State Dairy Association, and Iowa Corn Growers Association.

CADY, Justice.

Worth County and the Worth County Board of Supervisors, collectively referred to as "the County," appeal from a district court order declaring the County Rural Health and Family Farm Protection Ordinance to be void and unenforceable. On our review, we affirm the judgment of the district court.

## I. Background Facts and Proceedings

Iowa is largely defined by its proud and rich agricultural economy. Approximately ninety percent of the land within its borders is devoted to agriculture, and the presence of agriculture in Iowa not only profoundly impacts all its residents, but, literally, the world beyond.[1]

While agriculture has been woven into the very fabric of this state over each passing generation, one segment of this

---

1. *See* Econ. Research Serv., U.S. Dep't of Agric., *The Economics of Food, Farming, Natural Resources, and Rural America: Iowa State Fact Sheet* (Aug. 2., 2004), *available at* http://www.ers.usda.gov/statefacts/IA.htm [hereinafter *Iowa State Fact Sheet*] (stating that in 2002, 88.7% of Iowa's total land area was farmland); Patty Judge, *Iowa Ag Innovation Center Helping Iowa's Producers with Value–Added Initiatives*, News to Grow On (Iowa Dep't of Agric. & Land Stewardship), Feb. 6, 2004 ("[O]ver ninety-two percent of Iowa's land [is] in production agriculture. . . .").

fertile heritage has been the subject of difficult debate and discourse within the last decade. This debate centers on livestock confinement operations, particularly hog confinements. The strength and longevity of the debate directly relates to the corresponding increase in the number and size of hog confinement operations in Iowa.[2] Pork is a multibillion-dollar Iowa industry and now employs nearly 100,000 people.[3] While the impact of hog production on the Iowa economy is substantial, its recent growth has engendered many concerns over its impact on the environment, the health of its workers, and the quality of life of nearby residents and Iowans in general. Large confinements generate a staggering amount of animal waste, which gives rise to legitimate concerns about air quality and contamination of lakes and streams, as well as underground water.[4]

As a result of these concerns, and others, Worth County, located in north-central Iowa, enacted a county ordinance in 2001 called the "Rural Health and Family Farm Protection Ordinance." The ordinance was the thoughtful product of the cumulative work of the Worth County Board of Health, a citizen advisory committee, and the Board of Supervisors. In essence, the ordinance addressed three areas:

1. It prohibited "the emission of objectionable odorous air contaminants or toxic air emissions from confinement structures, manure storage and treatment, waste disposal modalities, land application, and/or carcass disposal to degrade air quality." The ordinance set specific concentrations for carbon dioxide, hydrogen sulfide, methane, carbon monoxide, and ammonia. If a complaint was filed, the County would take air samples at the site of the operation. An operation that violated the standards was then given ten business days to correct the violation.

2. It required a livestock operation to meet indoor air quality standards for hydrogen sulfide, ammonia, carbon monoxide, carbon dioxide, and dust. It mandated that operators test employees at the inception of the employment for pulmonary function and tuberculosis.

3. It required a livestock operation to install underground water monitoring wells to monitor for contaminants according to Environmental Protection Agency (EPA) standards.

One month after the ordinance was passed, an association called "Friends of Agriculture," Worth County Farm Bureau, and several interested residents of the county filed a petition for declaratory judgment and a writ of certiorari in district court. The group, collectively referred to as the "agricultural group," asked the court to declare the ordinance invalid and illegal. They eventually sought summary judgment, as did the County.

**2.** *See* Steve White, Note, *Hog Wild: A Look at the Issue of Meatpacker Ownership of Livestock at the Federal and State Level,* 52 Drake L.Rev. 793, 797 (2004) (noting an increase in the number of large hog and cattle operations in recent years).

**3.** *See Iowa State Fact Sheet* (stating that in 2000, 22.2% of Iowa's population worked in farm-related jobs); Daniel M. Otto et al., *The Role of Agriculture in the Iowa Economy* (Aug. 1997), *available at* http://www. econ.iastate.edu/outreach/agriculture/AgImpactStudy/ reports/State.htm (discussing agriculture's economic contribution to Iowa).

**4.** Office of Water, Environmental Protection Agency, No. EPA–821–B–01–001, *Environmental Assessment of Proposed Revisions to the National Pollutant Discharge Elimination System Regulation and the Effluent Guidelines for Concentrated Animal Feeding Operations,* at x-xi, 1–1 to 1–2 (Jan.2001), *available at* http://www.epa.gov/ost/guide/cafo/pdf/EnvAssessPt1of2.pdf.

The district court found the ordinance was void and unenforceable because its subject matter was expressly preempted by state law.[5] The district court also determined the governing state law was not unconstitutional.

The County appealed. It claims the ordinance is not expressly preempted by state law. Even assuming it is preempted, the County claims the state law is contrary to the home-rule amendment to our state constitution and is unconstitutional.

## II. Scope of Review

■ Our scope of review is for correction of errors at law. *Goodell v. Humboldt County*, 575 N.W.2d 486, 491 (Iowa 1998). Our role is to decide whether the district court correctly applied the law to the undisputed facts. *Id.*

## III. The County's Home–Rule Authority

■ Before we discuss whether the county ordinance has been preempted by state law, we must first determine whether the ordinance is a valid exercise of the county's home-rule authority. *Id.* at 491–92. Article III, section 39A of the Iowa Constitution, which added county home rule by amendment in 1978, provides:

> Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly. The general assembly may provide for the creation and dissolution of joint county-municipal corporation governments. The general assembly may provide for the establishment of charters in county or joint-municipal corporation governments.
>
> If the power or authority of a county conflicts with the power and authority of a municipal corporation, the power and authority exercised by a municipal corporation shall prevail within its jurisdiction.
>
> The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state.

Thus, in order for a county ordinance to be a valid exercise of the home rule authority, it must (1) "determine their local affairs," and (2) not be "inconsistent with the laws of the general assembly."

■ Perhaps in an effort to avoid "judicial battles over the definition of 'local affairs,'" Christopher A. Novak, *Agriculture's New Environmental Battleground: The Preemption of County Livestock Regulations*, 5 Drake J. Agric. L. 429, 448 (2000) [hereinafter Novak], the legislature has described a county's powers broadly as "any function it deems appropriate to protect and preserve the rights, privileges, and property of the county or its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents," Iowa Code § 331.301(1). Under this description, almost anything qualifies as a local affair. However, this broad description, like the home-rule constitutional amendment, places an important qualification on counties' powers: they may only exercise pow-

---

5. In its analysis, the district court found the ordinance was not impliedly preempted. Because we ultimately agree with the district court that the subject of the county ordinance has been expressly preempted by state law, we do not address the issue of implied preemption.

ers "if not inconsistent with the laws of the general assembly." *Id.* In other words, counties may legislate on matters of state-wide concern unless they are preempted by the general assembly. *Goodell,* 575 N.W.2d at 492, 494 (citations omitted).

## IV. Preemption

It is an established principle of law that local government may not legislate those matters the legislative branch of state government has reserved to itself. *City of Council Bluffs v. Cain,* 342 N.W.2d 810, 812 (Iowa 1983). This legislative power to preempt local action is rooted in the county home-rule provision of our constitution and is essentially a doctrine of necessity justified by "the need to prevent dual regulation which would result in uncertainty and confusion." *Mo. Pac. R.R. v. Bd. of County Comm'rs,* 231 Kan. 225, 643 P.2d 188, 192 (1982); *see Goodell,* 575 N.W.2d·at 492 (stating that the source of preemption is the prohibition under the home-rule constitutional provision "of the exercise of a home rule power 'inconsistent with the laws of the general assembly'" (quoting Iowa Const. art. III, § 39A) (citing Sam F. Schiedler, *Implementation of Constitutional Home Rule in Iowa,* 22 Drake L.Rev. 294, 305 (1973)); *Craig v. County of Chatham,* 356 N.C. 40, 565 S.E.2d 172, 175 (2002) (preemption law is grounded in the need to avoid dual regulation). It recognizes that some matters, by their very nature, "inherently require uniform and consistent treatment at the state level" and are inappropriate "subjects for local regulation." 56 Am.Jur.2d *Municipal Corporations* § 329, at 368 (2000).

Under Iowa law, state law may preempt local laws expressly or impliedly. *Goodell,* 575 N.W.2d at 492. As indicated earlier, we only consider the doctrine of express preemption in this case.[6] Express preemption occurs when the general assembly specifically prohibits local legislation in an area or field by statutory language. *Id.* (citing *Chelsea Theater Corp. v. City of Burlington,* 258 N.W.2d 372, 373 (Iowa 1977)). A "local law that regulates in an area the legislature has specifically stated cannot be the subject of local action is irreconcilable with state law" and is invalid. *Id.*

Our legislature has enacted a statute that places limitations on ordinances adopted by a county. Iowa Code section 331.304A(2), which was passed shortly after our decision in *Goodell,* provides:

A county shall not adopt or enforce county legislation regulating a condition or activity occurring on land used for the production, care, feeding, or housing of animals unless the regulation of the production, care, feeding, or housing of animals is expressly authorized by state law. County legislation adopted in violation of this section is void and unenforceable and any enforcement activity conducted in violation of this section is void. A condition or activity occurring on land used for the production, care, feeding, or housing of animals includes but is not limited to the construction, operation, or management of an animal feeding operation structure, or aerobic structure, and to the storage, handling,

6. As we explained in *Goodell,*

Implied preemption occurs in two ways. When an ordinance "'prohibits an act permitted by a statute, or permits an act prohibited by a statute,'" the ordinance is considered inconsistent with state law and preempted.

Implied preemption may also occur when the legislature has "cover[ed] a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law."
*Goodell v. Humboldt County,* 575 N.W.2d 486, 493 (Iowa 1998) (citations omitted).

or application of manure or egg washwater.

The language of the statute expressly preempts the regulation of a "condition or activity occurring on land *used* for the production, care, feeding or housing of animals." *Id.* (emphasis added). This is a broad area or field, which reveals a clear intent by our legislature to regulate livestock operations in Iowa. Thus, the real question we face is not whether the legislature has expressly preempted an area or field, but whether the area or field expressly preempted by the state is the same area or field regulated by the county ordinance—that is, whether the ordinance "regulat[es] a condition or activity occurring on land used for the production, care, feeding, or housing of animals." *Id.* The test is whether the ordinance irreconcilably conflicts with the statute. *Goodell,* 575 N.W.2d at 492; *see also* Iowa Code § 331.301(4) ("An exercise of a county ordinance is not inconsistent with a state law unless it is irreconcilable with the state law.").

The County argues that its ordinance does not conflict with section 331.304A because it does not "regulate" confinement structures. Instead, the County insists the ordinance is a public health ordinance and that any indirect effect it may have on the production, care, feeding, or housing of animals does not create a conflict with the state law so as to trigger the preemption doctrine.

In determining the meaning of a statute, we first look to the statutory text. *State v. Truesdell,* 679 N.W.2d 611, 617 (Iowa 2004) ("We apply statutes as written by our legislature, and resort to our rules of construction in the event of an ambiguity." (citing *State v. Albrecht,* 657 N.W.2d 474, 479 (Iowa 2003)). However, neither the general definitional section of chapter 331 nor section 331.304A defines

"regulate." *See* Iowa Code §§ 331.101, .304A. Accordingly, "we look to prior decisions of this court, similar statutes, dictionary definitions, and common usage." *Bob Zimmerman Ford, Inc. v. Midwest Auto. I, L.L.C.,* 679 N.W.2d 606, 609 (Iowa 2004) (citing *Bernau v. Iowa Dept. of Transp.,* 580 N.W.2d 757, 761 (Iowa 1998)). Regulate means "to govern or direct according to rule" or "to bring under the control of law or constituted authority." Webster's Third New international Dictionary 1913 (2002); *accord Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 703 A.2d 1338, 1347 (1998); *see also Marshall v. Kan. City,* 355 S.W.2d 877, 882 (Mo. 1962) (en banc) ("The term 'regulate' as used in a delegation of municipal powers is one of broad import; it means generally to prescribe the manner in which a thing licensed may be conducted." (Citations omitted.)); *State ex rel. Cent. Outdoor Adver. Co. v. Leonhard,* 124 N.E.2d 187, 189 (Ohio Ct.Com.Pl.1953) ("To regulate means to adjust, order or govern by rule, method or established mode, to direct or manage according to certain standards." (Citations omitted.)).

Clearly, the Worth County ordinance "govern[s] or direct[s] according to rule" "a condition or activity occurring on land used for the production, care, feeding, or housing of animals." *See* Iowa Code § 331.304A(2). As previously noted, it sets standards for toxic and odorous air emissions, safety for workers in confinement feeding operations, and water pollution by confinement feeding operations. Nevertheless, the County responds that some leeway must be recognized in applying the preemption doctrine to exclude local regulation of an activity that only indirectly impacts the preempted activity. The County argues if its ordinance is preempted by section 331.304A(2) because it "regulat[es] a condition or activity occur-

ring on land used for the production, care, feeding, or housing of animals," then many other county ordinances, such as ordinances relating to storage of hazardous materials and construction standards for water wells, are also preempted. The County urges that we adopt a "common sense" approach.

■■ Whether the additional ordinances cited by the County are preempted by section 331.304A(2) is not an issue before us. Our primary concern in interpreting a statute is to determine and effectuate the legislature's intent. *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 750 (Iowa 2002) ("The ultimate goal 'is to ascertain and give effect to the intention of the legislature.'" (quoting *John Deere Dubuque Works v. Weyant*, 442 N.W.2d 101, 104 (Iowa 1989)). Although the language of section 331.304A itself is sufficiently clear to show the general assembly intended to prohibit counties from regulating livestock confinement operations, there is additional evidence of that intent.

One commentator described the circumstances surrounding the enactment of the statute as follows:

> Shortly before the Iowa Supreme Court released its opinion [in *Goodell*], the leaders of the Iowa Legislature announced their intent to preempt county regulation of livestock operations. On April 13, 1998 House File 2494 passed the Iowa House on a 59–40 vote. The compromise legislation incorporated a narrower Senate provision that only preempted county regulation of livestock operations, and not broader agricultural activities as the House originally desired. The principal purpose of the legislation is found in section nine of the Act, which amends chapter 300 of the Iowa Code, the County Home Rule Authority provisions. The Act created code section 331.304A, which specifically

precludes a county from "adopt[ing] or enforc[ing] county legislation regulating a condition or activity occurring on land used for the production, care, feeding, or housing of animals unless the regulation of the production, care, feeding, or housing of animals is expressly authorized by state law."

Novak, 5 Drake J. Agric. L. at 456.

Moreover, while Worth County promotes its ordinance as a health measure, its plain effect is to regulate activities that are a part of livestock confinement operations. The state law and the local ordinance not only share a common locus, but the activity regulated by the ordinance is, in effect, the same activity reserved for state regulation under state law. One activity of a livestock confinement operation involves the accumulation and disposal of manure. The county ordinance, while promoting health, regulates that activity by limiting manure contamination of air in and around a confinement facility, as well as contamination of the land and underground water. Thus, it regulates health only by requiring livestock confinement operators to engage in practices to avoid violating the ordinance. This creates an irreconcilable conflict with the state law. When the county ordinance is stripped of its health label, it is clearly exposed as an ordinance that regulates the manner and operation of livestock production.

We conclude the Worth County ordinance is the type of ordinance expressly preempted by the state statute. Our legislature intended livestock production in Iowa to be governed by statewide regulation, not local regulation. It has left no room for county regulation. The County nevertheless argues that even if that is the case, section 331.304A is unconstitutional and therefore cannot preempt the ordinance.

## V. Constitutionality of Section 331.304A

 The County correctly observes that article III, section 39A was adopted to change the balance of power between state and county governments from that expressed in the Dillon rule[7] to that expressed in home rule. *City of Clinton v. Sheridan*, 530 N.W.2d 690, 691 (Iowa 1995). However, the amendment did not shift all legislative power to counties. The home-rule amendment expressly provides: "County ... governments are granted home rule power and authority, *not inconsistent with the laws of the general assembly*, to determine their local affairs and government...." Iowa Const. art. III, § 39A (emphasis added). Thus, "the intention of the framers of the amendment was to grant [counties] power to rule their local affairs and government (other than to levy taxes), subject to the superior authority of the General Assembly." *Bechtel v. City of Des Moines*, 225 N.W.2d 326, 332 (Iowa 1975) (citation omitted). By enacting section 331.304A, the legislature has exercised its superior authority, expressly retained in the home-rule amendment, to preempt county regulation of livestock confinement facilities. Accordingly, we conclude section 331.304A is not unconstitutional under article III, section 39A of the Iowa Constitution.

## VI. Conclusion

Having determined that section 331.304A expressly preempted the Worth County ordinance and that it is not unconstitutional, the result is that the ordinance "is void and unenforceable." Iowa Code

7. Under the *Dillon* rule municipal corporations possessed and could exercise only those powers granted in express words, or those necessarily implied or incident to the powers expressly granted, or those absolutely essential to the declared objects and purposes of the municipality.

§ 331.304A(2). Thus, we affirm the district court's decision granting summary judgment.

**AFFIRMED.**

*City of Clinton v. Sheridan*, 530 N.W.2d 690, 691 (Iowa 1995) (citing *Bechtel v. City of Des Moines*, 225 N.W.2d 326, 328–29 (Iowa 1975)); *see also* Osborne M. Reynolds, *Local Government Law* 49 (2d ed.2001) (discussing the Dillon rule).